STATE OF CONNECTICUT *v.* REGINALD HILL
(12830)

PETERS, C. J., HEALEY, SHEA, DANNEHY and S. FREEDMAN, Js.

Argued October 7—decision released December 9, 1986

*Joseph G. Bruckmann,* assistant public defender, with whom, on the brief, was *Joette Katz,* public defender, for the appellant (defendant).

*Robert J. O'Brien,* assistant state's attorney, with whom, on the brief, was *Arnold Markle,* state's attorney, for the appellee (state).

DANNEHY, J. A jury found the defendant, Reginald Hill, guilty of the offense of possession of a sawed-off shotgun in violation of General Statutes § 53a-211 (a).[1] The defendant forthwith filed a motion to set aside the verdict. The trial judge denied the motion and sentenced the defendant to the custody of the commissioner of correction for five years. In the same trial the defendant was also convicted of using a motor vehicle without the owner's permission, but the defendant does not claim error with regard to that conviction.

There is no dispute as to the following facts. On June 12, 1984, Irene Lasko notified the police that her

[1] "[General Statutes] Sec. 53a-211. POSSESSION OF A SAWED-OFF SHOTGUN OR SILENCER: CLASS D FELONY. (a) A person is guilty of possession of a sawed-off shotgun or a silencer when he owns, controls or possesses any sawed-off shotgun that has a barrel of less than eighteen inches or an overall length of less than twenty-six inches or when he owns, controls or possesses any silencer designed to muffle the noise of a firearm during discharge."

car was missing. In the early morning of the following day, Officer Vincent Raucci of the New Haven police department and his partner Officer Richard Poulten were patrolling in East Rock Park in New Haven when they observed a motor vehicle approaching from the opposite direction. When the approaching car reached a distance of about fifty feet from the officers' vehicle, the driver of the car negotiated a U-turn, accelerated the vehicle, and sped away. The pursuing officers radioed for a check on the registration of the vehicle. They were informed by return broadcast that the car was the stolen Lasko vehicle. After a chase for a distance of approximately one half mile, the officers stopped the fleeing car. The vehicle was occupied by the defendant, who was in the driver's seat, and a single passenger, Vaughn Outlaw, who was seated in the front passenger's seat. An examination of the car disclosed in the middle of the front seat a red nylon "gym bag" which contained five .16 gauge shotgun shells and a Bic lighter. On the floor beneath the front passenger's seat was a sawed-off shotgun. Both the driver and the passenger were arrested and charged with possession of a sawed-off shotgun and larceny in the second degree.

The defendant did not testify at the trial; Outlaw testified for the prosecution. His testimony indicated that he had known the defendant for about five years. It was also brought to the jury's attention that at the time of this incident the witness was on furlough from the Connecticut Correctional Institution, Cheshire. Outlaw related to the jury that at approximately 12:30 a.m. on June 13, 1984, as he was walking to his aunt's house, the defendant stopped the car he was driving and offered him a ride. Outlaw got into the car, and, after they had gone some distance, the defendant drove into East Rock Park and there they were apprehended and arrested. According to Outlaw, the defendant told him

not to worry and to tell the police that the defendant had picked him up. Outlaw testified that he had not brought into the car any of the items seized by the police, and that he had not seen the red gym bag while he was riding with the defendant. He also repeatedly stated that he was unaware of the presence of the sawed-off shotgun.

After Outlaw had testified for the state, defense counsel cross-examined Outlaw extensively about the charges pending against him, his furlough status and any arrangement between Outlaw and the state. Defense counsel was allowed great latitude to ask pointed questions in an attempt to show the jury why Outlaw might be motivated to slant his testimony in order to avoid being convicted on the charges pending against him. The defendant then called his cousin, Darryl Henry, as a witness. Through Henry's testimony, the defendant sought to show that Outlaw, and not the defendant, was the one in possession of the sawed-off shotgun. According to Henry, he saw Outlaw on June 12, 1984, and, at that time, Outlaw showed him a sawed-off shotgun in a gym bag. Henry claimed that Outlaw told him that the shotgun was his "Mastercharge" and that "[w]ith this I can get anything." Henry identified the sawed-off shotgun and gym bag exhibited in evidence as those displayed to him by Outlaw on June 12, 1984.

Thus, it appears that the case was in great part one of credibility of the defense witness as opposed to that of Outlaw and the other witnesses who were called by the state. It is unnecessary to relate additional facts, as this appeal is based wholly upon the defendant's claims that the trial court erred in denying his oral motion for a mistrial and in a certain instruction to the jury.

The defendant's first claim on appeal is that the trial court erred in refusing to discharge the jury because

of what he asserts was inadmissible and prejudicial testimony. The incident to which the defendant refers occurred during the redirect examination of Outlaw's mother, Barbara Bethea, called as a witness by the state. On recross-examination,[2] Bethea had testified that the defendant in a conversation with her had said "that he was going to see that Vaughn [Outlaw] walked." Bethea also testified that in the same conversation she had told the defendant that unless the situation involving her son was cleared up, she "was going to come down here and tell . . . what [she] knew." Her redirect examination proceeded as follows: "Q. When you say you were going to come down here and tell what you know, what were you referring to? A. What was I referring to? The conversation I had with his mother. She had told me it was Reggie's gun." The defendant objected to the hearsay response and asked that it be stricken. The objection was sustained. The court struck the answer from the record and admonished the jury not to consider it. When Bethea finished her testimony, the trial was interrupted at the defendant's request, and a proceeding took place outside the presence of the jury during which defense counsel moved for a mistrial. The trial judge stated to defense counsel that he saw no grounds for finding any attempt on the part of the state to elicit the hearsay response. The defense counsel agreed but told the court: "What I think, your Honor, it presents us in a precarious position where I don't think [the defendant] can receive a fair trial at this point. I don't think a jury can disregard such a statement." The trial judge denied

---

[2] After Barbara Bethea had been examined and cross-examined, several sets of redirect and recross-examination followed. The allegedly prejudicial instance referred to here occurred during the third recross-examination and the fourth redirect examination.

the motion, noting, in effect, that the occurrence could be cured by instruction.[3]

Our general rule on the subject of motions for mistrial is well settled. A motion for mistrial is granted only where it is apparent to the court that as a result of some occurrence during trial a party has been deprived of the opportunity for a fair trial. *State* v. *Gaston,* 198 Conn. 490, 495, 503 A.2d 1157 (1986); *State* v. *Maldonado,* 193 Conn. 350, 356, 478 A.2d 581 (1984); *State* v. *Ubaldi,* 190 Conn. 559, 562, 462 A.2d 1001, cert. denied, 464 U.S. 916, 104 S. Ct. 280, 78 L. Ed. 2d 259 (1983). A determination of whether a mistrial is warranted is left to the sound judgment and discretion of the trial judge. *State* v. *Gaston,* supra, 496; *State* v.

---

[3] The entire colloquy was as follows:

"Mr. Brunswick: Your Honor, before I could object Mrs. Bethea volunteered some information that Reginald Hill's mother told her that the gun—

"The Court: Told her that the gun was Reginald's gun.

"Mr. Brunswick: Right. Now I know your Honor instructed the jury to disregard it, but I think such a statement is of such a volatile nature that I think I should move for a mistrial. I know it's not something done intentionally on the part of the State, the witness volunteered it.

"The Court: What was the question asked by the State?

"Mr. Brunswick: Something totally unrelated to what Reginald—

"Mr. O'Brien: Something about what she said to Mr. Brunswick's question she would come down and tell all she knew.

"The Court: Who was asking the questions? Let's have the question read back.

(Whereupon the reporter read back the following [question].)

"The Court: Well, it doesn't appear to be any deliberate attempt on the State's part to [elicit] this improper response.

"Mr. Brunswick: I am not saying it's any attempt on the part of the State to [elicit] this response. I am sure he didn't even know what the response would be or that that would be the response.

"Mr. O'Brien: No, I anticipated she would just reiterate—

"Mr. Brunswick: What I think, your Honor, it presents us in a precarious position where I don't think he can receive a fair trial at this point. I don't think a jury can disregard such a statement.

"The Court: Well, we ask the jury to disregard things they hear all of the time. We have to give them some credit for honesty and intelligence. I think I will deny the motion at this time."

*Maldonado,* supra. When Bethea repeated a statement made to her out of court and outside the presence of the defendant, the trial judge was in the best position to decide whether the statement was so prejudicial, in light of the entire proceedings, as to deny the defendant a fair trial. The trial judge acted promptly in striking the hearsay statement and in instructing the jury not to consider it in reaching a decision. The instruction was repeated in the final charge. We must assume that the trial judge was satisfied that Bethea's hearsay response did not place the defendant in a "precarious position" from which a curative instruction could not extricate him. Under these circumstances, we find no error in the trial court's determination that the hearsay statement did not deprive the defendant of a fair trial. *State* v. *Ubaldi,* supra, 563. The motion for a mistrial on the basis of Bethea's hearsay response was properly denied.

We next consider the defendant's contention that the jury was erroneously instructed regarding "possession," an element of the offense with which the defendant was charged. The defendant argues that the statutory definition of the word "possess," contained in General Statutes § 53a-3 (2)[4] is satisfied in only two situations: first, where a person has actual physical possession; and second, where a person has exercised dominion or control over an object. The essence of the defendant's claim is that the trial judge erroneously defined "possession" to include a third situation: Where a person has the opportunity or power to exercise dominion or control over an object.

---

[4] "[General Statutes] Sec. 53a-3. DEFINITIONS. Except where different meanings are expressly specified, the following terms have the following meanings when used in this title . . . (2) 'Possess' means to have physical possession or otherwise to exercise dominion or control over tangible property."

We must first consider whether this issue was properly preserved for review. At the conclusion of both the court's instructions and reinstruction, extended colloquy occurred between the court and defense counsel in which counsel made a number of suggestions to the court concerning the instructions and took exception to a part of the instructions. Defense counsel did not, however, suggest that the court had not accurately defined the word "possession," nor did he object or except to the definition given. We generally do not consider a claimed error regarding the giving of or failure to give an instruction "unless the matter is covered by a written request to charge or exception has been taken . . . immediately after the charge is delivered." Practice Book § 852 (formerly § 854); see *State* v. *Fullwood,* 193 Conn. 238, 259, 476 A.2d 550 (1984); *State* v. *Alston,* 5 Conn. App. 571, 573, 501 A.2d 764 (1985), cert. denied, 198 Conn. 804, 503 A.2d 1186 (1986). In addition, the exception taken must "state distinctly the matter objected to and the ground of objection." Practice Book § 852.

Because this procedure was not followed, we need not consider the defendant's challenge to the court's instructions unless his allegations raise a claim that he has been denied a fundamental constitutional right and a fair trial. See *State* v. *Evans,* 165 Conn. 61, 70, 327 A.2d 576 (1973). An accused has a fundamental right, protected by the due process clauses of the federal and Connecticut constitutions, to be acquitted unless proven guilty of each element of the charged offense beyond a reasonable doubt. U.S. Const., amend. XIV; Conn. Const., art. I, § 8; see *In re Winship,* 397 U.S. 358, 362, 90 S. Ct. 1068, 25 L. Ed. 2d 368 (1970); *State* v. *Smith,* 194 Conn. 213, 217, 479 A.2d 814 (1984). This court has consistently held that a claim like the one made here, that the judge improperly instructed the jury on an element of an offense, is appealable even if not raised

at trial. *State* v. *Zayas,* 195 Conn. 611, 616, 490 A.2d 68 (1985); *State* v. *Smith,* supra; *State* v. *Maltese,* 189 Conn. 337, 341–42, 455 A.2d 1343 (1983).

Having determined that the defendant's second claim is properly before us, we must now consider whether the judge's instructions were so erroneous as to deprive the defendant of his constitutional right to a fair trial. *State* v. *Cobb,* 199 Conn. 322, 324, 507 A.2d 457 (1986). For an individual to be guilty of possession of a sawed-off shotgun, the state must prove that he "owns, controls or possesses" the shotgun. General Statutes § 53a-211 (a). The trial judge instructed the jury that "[t]he law recognizes two kinds of possession; actual possession and constructive possession." After defining actual possession, the judge explained the meaning of constructive possession in the following language: "A person who, although not in actual possession, knowingly has the power and the intention at a given time of exercising dominion and control over a thing is then in constructive possession." The defendant argues that this explanation, coupled with the examples of possession given by the judge,[5] expanded the meaning of the term "possess" beyond its statutory definition. We disagree.

General Statutes § 53a-3 (2) provides: "Except where different meanings are expressly specified, the following terms have the following meanings when used in this title . . . 'Possess' means to have physical pos-

---

[5] The trial judge used the following examples: "You possess the articles on your person because they obviously are within your immediate control or dominion. I possess the book on this desk in front of me, even though it actually belongs to the State of Connecticut, simply because it is before me and subject to my control and dominion. Ownership, therefore, is not required for possession. I also possess a briefcase which happens to be in the office because it's under my control. I possess my car which is out in the parking lot, but it's also under my control. I possess the furniture and other items in my home even though I am not actually there."

Although these examples appear to omit the mental intent necessary for possession, this element was adequately explained in the court's explanation of the concept of constructive possession.

session or otherwise to exercise dominion or control over tangible property." General Statutes § 53a-211 (a), which describes the crime of possession of a sawed-off shotgun, does not define the word "possess." The meaning prescribed in § 53a-3 (2) is therefore controlling. The latter part of § 53a-3 (2) makes clear that the definition of "possess" includes not only actual possession but also the exercise of "dominion or control" over an object. Connecticut has long recognized this concept of constructive possession. *State* v. *Gabriel,* 192 Conn. 405, 423, 473 A.2d 300 (1984); *State* v. *Williams,* 169 Conn. 322, 335, 363 A.2d 72 (1975); *State* v. *Gonski,* 155 Conn. 463, 467, 232 A.2d 483 (1967); *State* v. *Lopez,* 5 Conn. App. 599, 607, 502 A.2d 418 (1985), cert. denied, 199 Conn. 803, 506 A.2d 146 (1986). The definition and examples of constructive possession given here by the trial judge are nearly identical to those approved by this court in *State* v. *Williams,* supra.[6] The defendant correctly points out, however, that in *Williams* a challenge was not made under the definition of "possess" found in § 53a-3 (2). He argues that because penal statutes are to be strictly construed; see *State* v. *Paradise,* 189 Conn. 346, 352, 456 A.2d 305

---

[6] The trial judge in *State* v. *Williams,* 169 Conn. 322, 335 n.2, 363 A.2d 72 (1975), instructed the jury as follows: "Now, a person who although not in actual possession knowingly has the power and the intention at a given time to exercise dominion or control over a thing is then in constructive possession of it. The word possession as used in the statute has no technical meaning. It does not mean that one must have a narcotic substance upon his person although that is one form of possession. It means having something under one's control or dominion. As you ordinarily speak of things, we possess a thing which we have under our immediate control or dominion. You possess the articles on your person because they obviously are within your immediate control or dominion. I possess this book on the desk in front of me even though it actually belongs to the State of Connecticut simply because it is before me and subject to my control and dominion. I also possess a briefcase which happens to be in my chambers because it is under my control. I possess my car which is out in the parking lot because it is also under my control. I possess the furniture and other items in my home even though I am not actually there now for the same reason. . . . Regarding the question of dominion and control of the heroin, you are entitled to draw reasonable and logical inferences from the evidence that is before you."

(1983); the phrase "to exercise dominion or control" in § 53a-3 (2) should be construed to include only a scenario in which a person *has exercised* dominion or control, but not one in which a person knowingly has *the power and intention* to exercise dominion or control. We decline to adopt the defendant's narrow reading of the statutory definition of "possess."

We note that in *Williams* the defendant was charged with possession of a controlled substance with intent to sell in violation of General Statutes (Rev. to 1972) § 19-480 (a), and possession of a narcotic substance in violation of General Statutes (Rev. to 1972) § 19-481 (a). *State* v. *Williams,* supra, 323–24. These offenses are not included in our penal code, Title 53a of the Connecticut General Statutes, and, consequently, are not subject to the definition of possession found in § 53a-3.[7] The statutes are, however, criminal in nature and, like the offense of possession of a sawed-off shotgun, involve the unlawful possession of an item. Related statutory provisions, or statutes "in pari materia," often provide guidance in determining the meaning of a particular word. *Connecticut Light & Power Co.* v. *Costle,* 179 Conn. 415, 422, 426 A.2d 1324 (1980); *Doe* v. *Institute of Living, Inc.,* 175 Conn. 49, 58, 392 A.2d 491 (1978); 2A J. Sutherland, Statutory Construction (4th Ed. 1984) § 51.01. An approved definition of "constructive possession" in the context of possession of

---

[7] We recognize that General Statutes § 53a-2 provides that the provisions of Title 53a "shall apply to any offense defined in this title or the general statutes, unless otherwise expressly provided . . . ." Because § 53a-3 *expressly provides* that the definitions contained therein "have the following meaning when *used in this title"* (emphasis added) it appears the legislature intended to restrict the scope of this provision to Title 53a only. See also General Statutes § 53a-5. Language found in General Statutes § 53a-3 (6) to the effect that a particular definition does not apply to certain statutes outside the penal code does not contravene this conclusion. The legislative history of that language indicates that the language was considered unnecessary but was added to cure some misinterpretations of the former statute. See 17 H.R. Proc., Pt. 6, 1974 Sess., pp. 3076–77; Conn. Joint Standing Committee Hearings, Judiciary, 1974 Sess., pp. 224, 238.

narcotics is therefore a persuasive precedent for our determination of the scope of the word "possess" as defined by § 53a-3 (2), as long as that approved definition is not inconsistent with the statutory definition.

To "possess," according to § 53a-3 (2), is to have actual physical possession "or otherwise to exercise dominion or control . . . ." In construing statutes, we have repeatedly adhered to the rule that words and phrases are to be construed according to the commonly approved usage of the language. *State* v. *Young,* 191 Conn. 636, 656, 469 A.2d 1189 (1983) (*Peters, J.,* dissenting); *State* v. *Grant,* 176 Conn. 17, 20, 404 A.2d 873 (1978); *State* v. *Moore,* 158 Conn. 461, 465, 262 A.2d 166 (1969). The phrase "to exercise dominion or control" as commonly used contemplates a continuing relationship between the controlling entity and the object being controlled. Webster's Third New International Dictionary defines the noun "control" as the "power or authority to guide or manage." The essence of exercising control is not the manifestation of an act of control but instead it is the act of being in a position of control coupled with the requisite mental intent. In our criminal statutes involving possession, this control must be exercised intentionally and with knowledge of the character of the controlled object. *State* v. *Avila,* 166 Conn. 569, 573, 353 A.2d 776 (1974); *State* v. *Harris,* 159 Conn. 521, 531, 271 A.2d 74 (1970), cert. dismissed, 400 U.S. 1019, 91 S. Ct. 578, 27 L. Ed. 2d 630 (1971). Construing the phrase "to exercise dominion or control" in § 53a-3 (2) to refer only to a case where an individual *has exercised* control, as defendant urges, would alter the meaning of the term "possess" as defined by the legislature in § 53a-3 (2).

The definition of "possess" contained in § 53a-3 (2) first appeared in our penal statutes in 1969, the year in which our penal code was extensively revised. The drafters of the new code relied heavily upon the Model

Penal Code and various state criminal codes, especially the penal code of New York. Conn. Joint Standing Committee Hearings, Judiciary, Pt. 1, 1969 Sess., p. 11. The definition of "possess" contained in the New York penal code is identical to that found in § 53a-3 (2). See N.Y. Penal Law § 10.00 (8) (McKinney 1975). The New York provision, which first appeared in that jurisdiction's statutes in 1967, has been interpreted to include situations where a person knowingly has the power and the intent to exercise dominion or control. See *People* v. *Perez,* 127 Misc. 2d 309, 310, 485 N.Y.S.2d 913 (1984); *People* v. *Stapleton,* 94 Misc. 2d 850, 852, 406 N.Y.S.2d 223 (1978). We acknowledge that similarity of language between the New York and Connecticut penal codes does not compel a like construction. *State* v. *Mastropetre,* 175 Conn. 512, 522, 400 A.2d 276 (1978). The New York construction of an identical statute, however, combined with our approval of the same interpretation in a related context; see *State* v. *Williams,* supra; and the common usage of the phrase "to exercise dominion or control," ineluctably lead us to conclude that the trial judge's instructions in the present case were not erroneous.

There is no error.

In this opinion the other justices concurred.