## JOAN NISBET *v.* JOSE OLMEDA ET AL.
### (4947)

SPALLONE, BIELUCH and STOUGHTON, Js.

Argued December 15, 1987—decision released June 21, 1988

*M. Donald Cardwell,* for the appellant (plaintiff).

*Dean M. Cordiano,* with whom, on the brief, was *Kirk D. Tavtigian, Jr.,* for the appellees (defendants).

BIELUCH, J. The plaintiff[1] filed a two count complaint against the defendants, Jose Olmeda and his employer, First Security Services Corporation, respectively, alleging, inter alia, that the defendants' negligence during an attempted bank robbery caused the injuries she suffered. The defendants raised the special defense that the plaintiff's own negligence was a substantial factor in causing her injuries.

A verdict of $20,000 was returned in the plaintiff's favor; this was reduced to $10,000 as a result of the jury's finding that the plaintiff was 50 percent contributorily negligent for her injuries. The plaintiff moved for an additur and filed a motion to set aside the verdict, both of which the court denied. The plaintiff has appealed from the judgment rendered on the verdict.

The plaintiff claims that the trial court erred (1) in charging the jury as to comparative negligence on the part of the plaintiff, (2) by submitting two plaintiff's verdict forms to the jury, one for each count of the complaint, and instructing the jury to return the same total verdict amount for each count, (3) in excluding certain evidence relevant to the second count of the complaint which alleged negligence on the part of the defendant First Security Services Corporation, and (4) in refusing to grant the plaintiff's motion for additur, and in denying the plaintiff's motion to set aside the verdict as inadequate and as against the evidence on the issue of damages. We find no error.

The jury could reasonably have found the following facts from the evidence adduced at trial. On April 18, 1978, the plaintiff was employed by Society for Sav-

---

[1] The plaintiff has married since filing the action and is now known as Joan Nisbet Wentworth.

ings as a clerk typist in its main office at 31 Pratt Street, Hartford. While working in the new accounts department in the first floor lobby of the bank on that date, she was approached by one Steven Shields under the pretext of applying for a loan. When the plaintiff turned around to direct Shields to the proper department, he pulled what was later determined to be a starter pistol out from under his denim jacket. Shields shouted that he was robbing the bank, and, turning the plaintiff around in her chair, held the starter pistol alternately to her temple and neck. Shields had blood-shot eyes and smelled strongly of liquor, leading the plaintiff to believe that Shields was under the influence of alcohol. She also thought that Shields was extremely deranged and unstable and meant to harm her. The metallic starter pistol looked and felt like a real weapon as it was pressed against her head and neck.

Within minutes after Shields took the plaintiff hostage, Norman Lee, a floorman[2] at the bank who had previously been a Hartford police officer for twenty-six years, calmly approached Shields and told him to put the gun away. Shields became agitated at that point and shouted to Lee that he wanted $100 bills immediately or he would "blow her head off." Lee asked the nearby tellers for money; they were in shock and none responded. Shields then ordered Lee to get everyone out of the bank, after which Lee and another floorman began evacuating people from the area. In Lee's opinion, Shields was deranged and would have carried out his threat to harm the plaintiff. Lee could not determine at that time if Shields' gun was real or just a starter pistol but, in any event, he knew from experience that the barrel of a starter pistol could be bored out to accommodate and fire a .22 caliber shell.

---

[2] Lee's job as floorman for the bank was primarily a position involving customer service. He carried no weapon and was not a security guard.

The defendant Jose Olmeda, the only security guard on duty at the bank on the morning of April 18, 1978, was then in the cafeteria on the second floor of the bank for his morning break and learned of the hostage situation approximately five mintues after it commenced.[3] An employee told Olmeda there was a "problem downstairs," but, despite Olmeda's inquiry, did not explain the nature of the problem. Olmeda then left the cafeteria and headed downstairs to investigate the incident.

When Olmeda came to the landing of the stairway, he was unable to see the plaintiff or Shields because his view of the lobby was blocked by two large pillars. Olmeda asked some people who had gathered on the landing what the problem was, but no one answered or acknowledged his question. Olmeda then proceeded at a rapid pace toward the area where Shields still held the plaintiff at gunpoint.

Shields and the plaintiff were alone when Olmeda entered the lobby area. Olmeda "had a panicked look on his face" when he came upon the situation. When Shields saw Olmeda, he ordered him to stop walking, but then, using foul and abusive language, ordered him to walk toward Shields and the plaintiff. Olmeda came within six to ten feet of the two. Shields, shouting and still using foul language, told Olmeda he wanted his gun, a .38 caliber pistol which was in Olmeda's holster. Olmeda tried to calm Shields, but Shields told him to "shut up and listen . . . or he [would] blow [the plaintiff's] . . . brains." Shields, who had become tense when Olmeda first approached, remained agitated and demanded that Olmeda step back. Olmeda did so, but Shields remained upset and continued swearing at Olmeda and demanding that he surrender his pistol.

Olmeda refused to relinquish his gun. The plaintiff, crying and upset, told Olmeda to do what Shields had

---

[3] The plaintiff did not claim that the defendants were negligent because Olmeda was absent on a morning break when the incident began.

demanded. Olmeda again refused. The plaintiff repeated her plea that Olmeda do what Shields wanted. After two or three further demands by Shields that he throw his gun to him, Olmeda finally decided to surrender the weapon. Olmeda made this decision because he could see that Shields would not cooperate, and because he believed Shields would kill the plaintiff if he did not give up his gun. Olmeda thought that Shields had a real gun, that he was irrational and that he intended to carry out his threat of harm to the plaintiff.

Olmeda was concerned that if he threw the gun to Shields, as was demanded of him, an accidental landing could discharge a bullet; he therefore placed his gun on the floor and slid it towards Shields. As Shields continued to shout at him, Olmeda slowly backed away and then left the lobby area. He subsequently assisted the police, who had been summoned by a silent alarm, in evacuating others who were still in the area.

During the confrontation with Shields, Olmeda did not run toward him, did not try to grapple with him, nor did he try to take the gun away. Olmeda removed his own gun from its holster only in response to Shields' demands and the pleas of the plaintiff.[4] Olmeda was not involved in the events which took place after he left the bank lobby.

Shields picked up the .38 caliber pistol Olmeda had given him, alternately placed it against the plaintiff's head and neck, discarded the starter pistol, and started dragging the plaintiff around the bank lobby with his arm around her neck. Shields became extremely upset when he noticed a police officer near one of the entrances to the bank, and he screamed at him to leave. The officer did not leave, but tried to discuss Shields' demands with him.

---

[4] As a result of his actions, Olmeda received a commendation from the Hartford police, as well as a letter of appreciation from the bank.

Shields then dragged the plaintiff into the tellers' area and demanded that she fill a canvas sack with $100 bills. The plaintiff told Shields that the drawers containing these bills were locked, and Shields angrily accused her of not cooperating with him. Suddenly, without warning, Shields fired a shot from the right side of the plaintiff's head which stunned her and singed her hair. Pointing the gun now at the plaintiff's throat, Shields dragged her to an exit from the bank and kicked open a door. Police officers who were standing nearby tried to calm Shields and reason with him, but he was very nervous and upset. Shields demanded that they provide him with money, a helicopter and a meeting with a bank officer.

The police subsequently informed Shields that his demands were refused. Shields became very angry and frustrated and repeatedly threatened that he would kill the plaintiff if his demands were not met. With his arm around her neck and the gun alternately pointed at her head and neck, Shields continued to threaten the plaintiff and dragged her to an exit by which approximately twelve police officers stood.

Shields, by this time, had become more nervous and agitated. He threatened once again that he would kill the plaintiff. The plaintiff heard Shields say "This is it." He then cocked the pistol which he was holding to her head. The plaintiff chose this moment to attempt an escape.

As the plaintiff tried to escape, an officer grabbed Shields. As Shields struggled with the officer, Shields' gun discharged and the bullet struck the back of the plaintiff's left leg. As several police officers then shielded the plaintiff with their bodies, other officers were able to disarm Shields in an altercation, during

which his pistol discharged several more bullets, none of which struck the plaintiff or any other person.[5]

The plaintiff suffered a broken femur in her left leg, was hospitalized in traction for six weeks and had a pin placed below her left knee to align her leg which had been dislocated when the bullet shattered the thigh bone. The pin was later removed and the plaintiff was placed in a body cast. After the plaintiff was discharged from the hospital, she remained in the cast for three months. The plaintiff underwent six weeks of physical therapy after the cast was removed, used crutches for one month and then a cane for an undetermined time period. As a result of the injury, the plaintiff's left leg is approximately three quarters of an inch shorter than her right leg, and she has a 20 percent permanent partial disability of her left leg. The plaintiff was able to return to work in January, 1979. As of October, 1979, approximately one and one-half years after her injury, the plaintiff could perform 95 percent of her normal activities without any restriction. The injury was stable, there was little possibility of future problems, and the plaintiff had not sought medical treatment since October, 1979.

The bank had trained the plaintiff how to react to a robbery situation: to remain calm, to cooperate with demands, to refrain from doing anything to agitate the robber, and not to use any physical force to prevent a robbery. The plaintiff admitted that her action "could be described as aggressive in the situation [she] was in." The opinion of the plaintiff's hostage crisis expert was that a hostage should not do anything to aggravate or agitate an assailant, and should not take aggressive action or try to be a hero.

---

[5] The plaintiff subsequently received a letter of commendation from the Hartford police which noted that her aggressive action prevented injury to the advancing officers.

The plaintiff has appealed from the judgment rendered on this verdict, following the denial of her motions for additur and to set aside the verdict. The plaintiff sets forth five claims of error, one of which was withdrawn at oral argument and will therefore not be considered.

I

The plaintiff's first claim is that the trial court committed error with respect to its jury instruction on contributory negligence. The plaintiff maintains that the court's charge was contrary to law in two respects. First, she argues that the court erroneously instructed the jury that the plaintiff was bound by the same duty of care as were the defendants, and, second, that the court did not adequately charge the jury as to the law of proximate causation as such law applied to the plaintiff's alleged contributory negligence. We do not address this claim because the plaintiff failed to satisfy the requirements of Practice Book §§ 315 and 4185.

This court is not bound to consider a claim of error as to the giving of, or failure to give, a jury instruction unless the claimed error is covered by a written request to charge or an exception has been taken by the appellant immediately after the charge is delivered. Practice Book § 315. The exception taken "shall state distinctly the matter objected to and the ground of objection." Id; State v. Williams, 202 Conn. 349, 362, 521 A.2d 150 (1987); State v. Hill, 201 Conn. 505, 512, 518 A.2d 388 (1986); State v. Avila, 13 Conn. App. 120, 124, 534 A.2d 913 (1987). In lieu of a request to charge, the plaintiff filed a written set of "Proposed Jury Instructions" consisting of nineteen pages and purporting to be a complete charge covering all relevant instructions, general and specific, pertaining to the issues before the court, in a ready-made format for delivery by the trial judge to the jury and in a text

desired by the plaintiff. In no respect did this charge conform to or meet the requirements of Practice Book § 854.[6]

The plaintiff did not take an exception to either of the claimed errors which "state[d] distinctly the matter objected to and the ground of objection." Practice Book § 315. The plaintiff had an obligation to make her claims clearly known to the court so that it could decide whether to correct any claimed error in the jury charge. *Bevins* v. *Brewer,* 146 Conn. 10, 12–13, 147 A.2d 189 (1958); *Smith* v. *Czescel,* 12 Conn. App. 558, 562 n.2, 533 A.2d 223 (1987). " 'The purpose for this rule is to alert the trial court so that it can "cure any defects or ambiguities in the charge." ' " *Mihalek* v. *Cichowski,* 4 Conn. App. 484, 486, 495 A.2d 721 (1985), quoting *Giglio* v. *Hamilton Heights, Inc.,* 1 Conn. App. 165, 167, 469 A.2d 416 (1984); cf. *Bauman & Garrity of Lakeville, Inc.* v. *George E. Emerson, Inc.,* 14 Conn. App. 261, 264 n.2, 540 A.2d 710 (1988).

This court "may in the interest of justice notice plain error not brought to the attention of the trial court." Practice Book § 4185. Such review is, however, reserved for " ' "truly extraordinary situations where the existence of the error is so obvious that it affects the fairness and integrity of and public confidence in the judicial proceedings." ' " *Small* v. *South Norwalk Savings Bank,* 205 Conn. 751, 759, 535 A.2d 1292

[6] Practice Book § 854 provides: "When there are several requests, they shall be in separate and numbered paragraphs, each containing a single proposition of law clearly and concisely stated with the citation of authority upon which it is based, and the evidence to which the proposition would apply. Requests to charge should not exceed fifteen in number unless, for good cause shown, the court permits the filing of an additional number. If the request is granted, the judicial authority shall apply the proposition of law to the facts of the case.

"A principle of law should be stated in but one request and in but one way. Requests attempting to state in different forms the same principle of law as applied to a single issue are improper."

(1988); *State* v. *Hinckley,* 198 Conn. 77, 87–88, 502 A.2d 388 (1985); *Smith* v. *Czescel,* supra, 563.

"An important factor in determining whether to invoke the plain error doctrine is whether the claimed error 'result[ed] in an unreliable verdict or a miscarriage of justice.' *State* v. *Hinckley,* supra, 88." *Smith* v. *Czescel,* supra. Our review of the record and the charge as given leads to the conclusion that this is not such a case. The court's instructions as to the plaintiff's duty of care, as well as to the law of proximate causation, were not contrary to law. Despite the rather dramatic circumstances of the alleged negligence in this case, the court's charge did not give rise to a " 'manifest injustice amounting to plain error under all the circumstances.' " *Small* v. *South Norwalk Savings Bank,* supra, 760; *Valley* v. *Fazzina,* 187 Conn. 423, 428, 446 A.2d 1068 (1982). " 'The doctrine of plain error should be invoked sparingly. To hold otherwise would undermine the requirement that claims of law be raised in the trial court in the first instance.' *Berchtold* v. *Maggi,* 191 Conn. 266, 274, 464 A.2d 1 (1983)." *Small* v. *South Norwalk Savings Bank,* supra.

## II

The plaintiff also claims that the court erred in its submission of the verdict forms to the jury. The court furnished two sets of verdict forms, a plaintiff's verdict and an individualized defendant's verdict for each count. The court instructed the jury that if it found for the plaintiff on both counts of her two count complaint, it should return the two plaintiff's verdict forms with the same amount of damages on each. In other words, the court charged that the jury, if it found for the plaintiff on each of the two counts, was to return a verdict for the identical sum as to each count.[7]

---

[7] The court's instructions were, in relevant part, as follows: "Now, when you go into the jury room, you are going to have four verdict forms, two,

In the first count of her two count complaint, the plaintiff alleged that Olmeda's negligence during the attempted robbery caused her injuries. In the second count, the plaintiff claimed that First Security Services Corporation was liable for Olmeda's negligence, as his employer, as well as for its own negligence in his training. The trial court properly instructed the jury that First Security could be held liable to the plaintiff only if Olmeda were found negligent because there was no causative link, other than Olmeda's actions, between First Security's conduct and the plaintiff's injuries.

Although the verdict forms submitted to the jury might be loosely interpreted to indicate that the total judgment awarded to the plaintiff was $10,000 on each count, totalling $20,000 in the aggregate, the court and counsel for both parties agreed in chambers (1) that they would submit two verdict forms to the jury solely because the plaintiff's complaint contained two counts against different defendants, (2) that the jury could be instructed that the amount of the plaintiff's verdict, if any, must be for the same amount on each count, and (3) that the amount of the plaintiff's judgment upon the verdict would not be determined by adding the amounts of the verdict on each count, but would be specifically determined by the identical amounts of the verdict on each count. The court instructed the jury accordingly. In addition, after the two verdicts for the plaintiff were

a plaintiff's verdict form for count one, and a defendants' verdict form for count one, and a plaintiff's verdict form for count two, and a plaintiff's—a defendants' verdict form for count two. . . .

"I just want to say that if you find for the plaintiff on each of those two counts, the total amount of damages figured should be the same and the percentage of negligence and the net amount, so that in both counts we want to have the same amount. So if—that is if you come in with a plaintiff's verdict on two counts, which—but we also have defendant's verdict forms, so you can do whatever you have—whatever you want with them. And, if you have any question—and again, I do not think you will—but the thing I want to make clear is if you find for the plaintiff, I want your amounts to be the same for the first count and the second count."

returned, the court and the parties' counsel acknowledged and affirmed this agreement as to the verdict forms. It was then that plaintiff's counsel for the first time sought the addition of the two identical amounts.

The plaintiff's agreement to submit the verdict forms to the jury as recited above precludes her from claiming on appeal that the submission of the forms was error. *Crowder* v. *Zion Baptist Church, Inc.,* 143 Conn. 90, 97–98, 119 A.2d 736 (1956). A party may not claim as error that which she has requested. *LaCroix* v. *LaCroix,* 189 Conn. 685, 688, 457 A.2d 1076 (1983). A party is also bound by a concession made during trial by her attorney, the validity of which is not affected by the employment of new counsel on appeal. *Housing Authority* v. *Pezenik,* 137 Conn. 442, 448, 78 A.2d 546 (1951). In light of the agreement of plaintiff's counsel, the trial court did not err by submitting two sets of verdict forms to the jury, one for each count, and in instructing the jury to return identical verdicts on each count.[8]

### III

The plaintiff also claims that the court erred in excluding certain evidence which she maintains was relevant to the second count of her complaint alleging negligence on the part of the defendant First Security Services Corporation. During trial, the plaintiff sought

---

[8] Even if plaintiff's counsel had not agreed to the submission of two sets of verdict forms, the plaintiff failed to raise this alleged error in her motion to set aside the verdict. The verdict, therefore, would be reversible only if the court's action constituted plain error. *Pietrorazio* v. *Santopietro,* 185 Conn. 510, 515, 441 A.2d 163 (1981); *Kemp* v. *Ellington Purchasing Corporation,* 9 Conn. App. 400, 406, 519 A.2d 95 (1986). In light of the grounds of liability alleged in the two counts of the plaintiff's complaint against the employee and employer, respectively, the court's action was not erroneous and was a proper exercise of its broad discretion in matters concerning the conduct of the trial. See, e.g., *Tomczuk* v. *Alvarez,* 184 Conn. 182, 439 A.2d 935 (1981).

to elicit testimony from the defendant Jose Olmeda regarding the reason for the termination of his employment with the Hartford police department prior to his employment by the defendant First Security Services Corporation. This evidence was offered on the issue of whether First Security was negligent in its training of Olmeda. The defendant objected on the ground that the evidence would not be probative and would be unduly prejudicial. The court sustained the objection.

The court did not err in excluding the proffered evidence. The court held that the evidence was not relevant for the purpose for which it was offered. Although it would have been relevant to a claim of negligence in hiring, the plaintiff had not alleged that First Security was negligent in that regard. The plaintiff admitted that she had not made such an allegation, and attempted to amend her complaint then, but the trial court denied her request. The court also held that it would be unduly prejudicial to Olmeda if the evidence were admitted.

The trial court has broad discretion in determining the relevancy and materiality of evidence. *Web Press Services Corporation* v. *New London Motors, Inc.,* 203 Conn. 342, 355, 525 A.2d 57 (1987). " 'A ruling on relevancy falls within the trial court's broad discretionary powers and is subject to review by this court only to ensure that its discretion has not been abused.' *Filosi* v. *Hawkins,* 1 Conn. App. 634, 640, 474 A.2d 1261 (1984), citing *Hardisty* v. *Hardisty,* 183 Conn. 253, 257, 439 A.2d 307 (1981)." *Vazzano* v. *Slater,* 6 Conn. App. 1, 6, 502 A.2d 440 (1986). A court also has discretion to exclude relevant evidence on the ground that it is more prejudicial than probative. *Batick* v. *Seymour,* 186 Conn. 632, 637, 443 A.2d 471 (1982).

The trial court did not abuse its discretion in excluding this evidence. The evidence would have been rele-

vant to the issue of negligent hiring, but this claim was not alleged in the complaint. Futhermore, the plaintiff cannot meet her burden of establishing that the court erred in holding that any relevancy of the evidence was outweighed by its prejudicial effect, because the plaintiff failed to make an offer of proof as to the reason for the termination of Olmeda's employment with the Hartford police; see, e.g., *Pantlin & Chananie Development Corporation* v. *Hartford Cement & Building Supply Co.,* 196 Conn. 233, 239, 492 A.2d 159 (1985); and, as the plaintiff admits in her brief, it is not known whether any prejudice might have resulted to the defendant Olmeda if the evidence in question had been admitted.

## IV

The plaintiff's final claim is that the trial court erred in refusing to grant her motion for additur, and in denying her motion to set aside the verdict as inadequate and as against the evidence on the issue of damages. We disagree.

Section 52-228b of the General Statutes provides that upon written motion by a party, a verdict may be set aside respecting money damages. However, "[n]o such verdict may be set aside solely on the ground that the damages are inadequate until the parties have first been given an opportunity to accept an addition to the verdict of such amount as the court deems reasonable." Id. The plaintiff, accordingly, filed a motion for additur, which was denied by the court. The plaintiff then filed a motion to set aside the verdict claiming that the award of damages, before diminution for comparative negligence, was inadequate and contrary to the evidence presented to the jury on the issue of damages. This motion was also denied.

The trial court did not abuse its discretion by refusing to set aside the verdict as inadequate and as against

the evidence on the issue of damages. "The trial court's refusal to set aside a jury verdict is entitled to great weight and every reasonable presumption should be given in favor of its correctness. *Kalleher* v. *Orr*, 183 Conn. 125, 127, 438 A.2d 843 (1981); *Zarrelli* v. *Barnum Festival Society, Inc.*, 6 Conn. App. 322, 327, 505 A.2d 25, cert. denied, 200 Conn. 801, [509] A.2d [516] (1986). If, on the evidence, the jury could reasonably have decided as it did, we will not find error in the trial court's acceptance of the verdict." *Royer* v. *Hertz Corporation*, 9 Conn. App. 136, 140, 516 A.2d 1372 (1986). We must ascertain " 'whether the award falls somewhere within the necessarily uncertain limits of just damages or whether the size of the verdict so shocks the sense of justice as to compel the conclusion that the jury were influenced by partiality, prejudice, mistake or corruption.' " *Briggs* v. *Becker*, 101 Conn. 62, 66–67, 124 A. 826 (1924), quoted in *Nichols* v. *Coppola Motors, Inc.*, 178 Conn. 335, 349, 422 A.2d 260 (1979); see also *Taddei* v. *Schwarz*, 12 Conn. App. 659, 660, 533 A.2d 892 (1987); *Royer* v. *Hertz Corporation*, supra.

The jury reasonably could have awarded the plaintiff $20,000 in damages for her injuries based on the evidence presented. The court did not abuse its discretion in refusing to set aside that verdict. See *Zimny* v. *Cooper-Jarrett, Inc.*, 8 Conn. App. 407, 437, 513 A.2d 1235, cert. denied, 201 Conn. 811, 516 A.2d 887 (1986). " 'The concurrence of the judgments of the judge and the jury, who saw the witnesses and heard the testimony, is a powerful argument for sustaining the action of the trial court.' *Chanosky* v. *City Building Supply Co.*, 152 Conn. 642, 643, 211 A.2d 141 (1965)." *Taddei* v. *Schwarz*, supra, 661–62.

There is no error.

In this opinion the other judges concurred.