******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

ECKER, J., with whom PALMER and McDONALD, Js., join, concurring in part and dissenting in part. I respectfully dissent from part I of the majority opinion because I do not believe that the evidence was sufficient to support the conviction of the defendant, Amelia Rhodes, of criminal possession of a firearm in violation of General Statutes (Rev. to 2013) § 53a-217 (a). I concur in part II of the majority opinion, in which the majority upholds the defendant's conviction of having a weapon in a motor vehicle in violation of General Statutes (Rev. to 2013) § 29-38 (a), but on different grounds than those relied on by the majority.

I

A

In no conventional sense of the word did the defendant "possess" the firearm carried by her friend and passenger, Lamar Spann, on the afternoon of August 17, 2013.[1] She did not own it and had no legally cognizable possessory interest in it. She never was in actual physical possession of the firearm; she never physically held it or touched it, even for a moment, and the state never claimed otherwise. Likewise, the jury was presented with no evidence that the defendant herself at any time had the practical ability to obtain actual physical possession of the firearm. Nor was there any evidence that she occupied a position of authority over Spann that would have allowed her to direct him to use the firearm at her command. No evidence was presented that Spann previously had permitted the defendant to use his firearm or would have done so on this occasion upon request. Finally, there was not a shred of evidence at trial that the defendant intended to exercise control over the firearm itself, as opposed to the car in which it was located. Reversal of the defendant's conviction of criminal possession of a firearm is required under these circumstances because these significant evidentiary gaps cannot be filled in without resort to impermissible speculation and surmise.

As in many appeals challenging the sufficiency of the evidence supporting a criminal conviction, resolution of the defendant's claim requires us to determine the point at which permissible inference becomes impermissible speculation. I agree with the majority that where to draw this line in any particular case ultimately is a matter of judgment. I further agree that a reviewing court undertaking the task of line drawing must exercise maximum restraint and exhibit great deference to the jury's verdict due to the jury's vital, constitutional role in our system of justice; the majority rightly reminds us that we do not sit as a seventh juror. See *State* v. *Ford*, 230 Conn. 686, 693, 646 A.2d 147 (1994).

But there is more to the picture, because the same constitution also imposes limitations on the jury's power to convict an accused in a criminal case—there are other constitutional values at stake in addition to the jury right. In particular, a reviewing court is obligated to ensure that a criminal conviction is supported by evidence sufficient to find a defendant guilty of the crime charged beyond a reasonable doubt. See, e.g., *In re Winship*, 397 U.S. 358, 364, 90 S. Ct. 1068, 25 L. Ed. 2d 368 (1970); see also J. Newman, "Beyond 'Reasonable Doubt,' " 68 N.Y.U. L. Rev. 979, 980 (1993) (encouraging appellate courts "to take the [reasonable doubt] standard seriously as a rule of law against which the validity of convictions is to be judged"). In my judgment, the evidence in the present case fails to meet that high standard.

The rules governing appellate review in this context are well established. "The two part test this court applies in reviewing the sufficiency of the evidence supporting a criminal conviction is well established. First, we construe the evidence in the light most favorable to sustaining the verdict. Second, we determine whether upon the facts so construed and the inferences reasonably drawn therefrom the jury reasonably could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt." (Footnote omitted; internal quotation marks omitted.) *State* v. *Lewis*, 303 Conn. 760, 767, 36 A.3d 670 (2012). "In evaluating evidence that could yield contrary inferences, the trier of fact is not required to accept as dispositive those inferences that are consistent with the defendant's innocence. . . . The trier [of fact] may draw whatever inferences from the evidence or facts established by the evidence it deems to be reasonable and logical." (Internal quotation marks omitted.) *State* v. *Drupals*, 306 Conn. 149, 158, 49 A.3d 962 (2012). However, "[b]ecause [t]he only kind of an inference recognized by the law is a reasonable one . . . any such inference cannot be based on possibilities, surmise or conjecture. . . . It is axiomatic, therefore, that [a]ny [inference] drawn must be rational and founded upon the evidence. . . . [T]he line between permissible inference and impermissible speculation is not always easy to discern. When we infer, we derive a conclusion from proven facts because such considerations as experience, or history, or science have demonstrated that there is a likely correlation between those facts and the conclusion. If that correlation is sufficiently compelling, the inference is reasonable. But if the correlation between the facts and the conclusion is slight, or if a different conclusion is more closely correlated with the facts than the chosen conclusion, the inference is less reasonable. At some point, the link between the facts and the conclusion becomes so tenuous that we call it speculation." (Internal quotation marks omitted.) *State* v. *Lewis*, supra, 768–69.

No objective formula or uniform template tells us how to distinguish reasonable inference from impermissible speculation. It should be clear, however, that our appellate review may not rely on speculative guesswork any more than may the jury's verdict. This is not an exercise in appellate storytelling. Yet, I fear that the majority's effort to conjure a basis for the jury's verdict at times propels the majority into the realm of speculation, as when the majority pictures the jurors rolling their eyes or splitting their sides in laughter. See footnote 22 of the majority opinion and accompanying text. There are limitations on the inferences that may be drawn from the evidence. One such limitation is the requirement that an inference be reasonable, which means that it must be more than merely possible—it must be *probable*. This court has explained that "[a]n inference is not legally supportable . . . merely because the scenario that it contemplates is remotely possible under the facts. To permit such a standard would be to sanction fact-finding predicated on mere conjecture or guesswork. Proof by inference is sufficient, rather, only if the evidence produces in the mind of the trier [of fact] a *reasonable belief in the probability of the existence* of the material fact." (Emphasis in original; internal quotation marks omitted.) *State* v. *Reynolds*, 264 Conn. 1, 97, 836 A.2d 224 (2003), cert. denied, 541 U.S. 908, 124 S. Ct. 1614, 158 L. Ed. 2d 254 (2004); see also *State* v. *Copas*, 252 Conn. 318, 339–40, 746 A.2d 761 (2000) (although "[p]roof of a material fact by inference from circumstantial evidence need not be so conclusive as to exclude every other hypothesis," it must be sufficient to produce "in the mind of the trier [of fact] a reasonable belief in the probability of the existence of the material fact" (internal quotation marks omitted)). Anything less is mere "speculation and conjecture," which is "insufficient to sustain the burden of proof beyond a reasonable doubt . . . ." (Internal quotation marks omitted.) *State* v. *Sivri*, 231 Conn. 115, 131–32, 646 A.2d 169 (1994).

The point is an important one because it operates to prevent the dilution of a constitutional standard. The constitution does not require that the subordinate facts each be proven beyond a reasonable doubt, but it still forbids criminal convictions to be based on guesswork; a reviewing court will draw the line at verdicts resting on merely *possible* factual scenarios as opposed to *probable* ones. This key distinction explains why the majority misses the point when it suggests that this concurring and dissenting opinion reaches its conclusions by substituting its own "alternative explanations" and by preferring more "benign" and "innocent" interpretations of the evidence than those offered by the majority. The alternatives are provided to demonstrate the speculative nature of the inferences posited by the majority. The analysis, in other words, is intended to demand that the critical inculpatory inferences neces-

sary to reach a guilty verdict in this case were not conjectural on this factual record.

Although the majority correctly points out that "[w]e do not sit as the 'seventh juror' when we review the sufficiency of the evidence"; *State* v. *Ford*, supra, 230 Conn. 693; we also may not abdicate our constitutional responsibility to ensure that a criminal conviction is supported by sufficient evidence to find the defendant guilty beyond a reasonable doubt. Our sufficiency review "is not entirely toothless . . . for [w]e do not . . . fulfill our duty through rote incantation of [the principles governing a review of sufficiency of evidence] followed by summary affirmance." (Citation omitted; internal quotation marks omitted.) *United States* v. *Salamanca*, 990 F.2d 629, 638 (D.C. Cir.), cert. denied, 510 U.S. 928, 114 S. Ct. 337, 126 L. Ed. 2d 281 (1993). Although "[a] jury is entitled to draw a vast range of reasonable inferences from [the] evidence, [it] may not base a verdict on mere speculation"; (internal quotation marks omitted) id.; "and caution must be taken that the conviction not be obtained by piling inference on inference." (Internal quotation marks omitted.) *United States* v. *Jones*, 44 F.3d 860, 865 (10th Cir. 1995).

B

I now turn to the law of constructive possession.[2] Constructive possession is a "legal fiction . . . ." (Internal quotation marks omitted.) *United States* v. *Jones*, 872 F.3d 483, 489 (7th Cir. 2017), cert. denied,        U.S.    , 138 S. Ct. 936, 200 L. Ed. 2d 211 (2018), and cert. denied,        U.S.    , 138 S. Ct. 1023, 200 L. Ed. 2d 283 (2018); see id. ("[c]onstructive possession is a legal fiction whereby a person is deemed to possess [a gun] even when he does not actually have immediate, physical control of the [gun]" (internal quotation marks omitted)); *State* v. *Williams*, 110 Conn. App. 778, 787, 956 A.2d 1176 (describing "the legal fiction of constructive possession that can be inferred from the circumstances and can be the equivalent of actual possession"), cert. denied, 289 Conn. 957, 961 A.2d 424 (2008). The doctrine of constructive possession was devised to prevent individuals from evading culpability simply by divesting themselves of physical possession of, or title to, contraband while nonetheless maintaining dominion or control over the contraband in fact. See, e.g., *Henderson* v. *United States*, 575 U.S. 622, 627, 135 S. Ct. 1780, 191 L. Ed. 2d 874 (2015) ("[t]he idea of constructive possession is designed to preclude" individuals from divesting themselves of physical custody and title by "arranging a sham transfer that leaves [them] in effective control of [the contraband]"); *United States* v. *Bentvena*, 319 F.2d 916, 950 (2d Cir.) ("Quite frequently, the ringleaders or overlords of the narcotics business do not stultify themselves by possession when handlers can be so cheaply hired. Therefore, in an effort

to bring a modicum of reality into the picture," the courts created the doctrine of constructive possession.), cert. denied sub nom. *Ormento* v. *United States*, 375 U.S. 940, 84 S. Ct. 345, 11 L. Ed. 2d 271 (1963). The doctrine "allow[s] the law to reach beyond puppets to puppeteers." (Internal quotation marks omitted.) *Henderson* v. *United States*, supra, 627.

At a conceptual level, the need for the doctrine of constructive possession arises from an ambiguity in the operative word, "possession."[3] The ambiguity stems from the fact that "to possess" connotes a direct *physical* relationship between the possessor and the item at issue, at least when used in reference to tangible things; to possess a thing is to have and hold it. See, e.g., Webster's Third New International Dictionary (1961) p. 1770 (defining "possess" as, inter alia, "to have and hold as property").[4] It is this physical aspect of possession that created the need to develop a doctrine of "constructive" possession in the law, because the word must extend beyond a purely physical meaning to serve a useful role in structuring legal relations. Otherwise, "one could only possess what was under his hand." O. Holmes, The Common Law (1881) p. 236.

Jurists have long recognized that the modifier "constructive" must not be allowed to overwhelm the inherent limitation contained in the operative word, "possession." Judge Edward A. Tamm wrote the following cautionary words on this subject almost fifty years ago: "The rhetorical legerdemain compounded in this area of the law invokes abstractions which appear more designed to achieve a particular result in an individual case than to stabilize and formalize a workable index of objective standards. The more cases one reads on constructive possession the deeper is he plunged into a thicket of subjectivity. Successive cases enumerate a continuing [reinterpretation] which can only be described as judicial whimsy." *United States* v. *Holland*, 445 F.2d 701, 703 (D.C. Cir. 1971) (Tamm, J., concurring); cf. *Berkey* v. *Third Avenue Railway Co.*, 244 N.Y. 84, 94, 155 N.E. 58 (1926) (Cardozo, J.) ("[m]etaphors in law are to be narrowly watched, for starting as devices to liberate thought, they end often by enslaving it"). The majority's treatment of constructive possession in the present case, in my view, fails to adequately police the outer boundaries of the doctrine and, in doing so, fails to ensure that criminal laws of uncertain scope are interpreted and applied narrowly rather than expansively. See, e.g., *State* v. *LaFleur*, 307 Conn. 115, 126, 51 A.3d 1048 (2012) ("[w]hen the statute being construed is a criminal statute, it must be construed strictly against the state and in favor of the accused" (internal quotation marks omitted)).

Because the very concept of constructive possession is an abstraction, virtually every jurisdiction, including Connecticut, has found it necessary to develop doc-

trinal aids to help facilitate its application to the facts of any particular case. We begin with our penal code, which provides that " '[p]ossess' means to have physical possession *or otherwise to exercise dominion or control over tangible property . . . .*" (Emphasis added.) General Statutes § 53a-3 (2). Courts have added a judicial gloss to the statutory "dominion or control" language because those words,[5] like the word possession itself, are too broad to illuminate the nature and degree of control that equates to actual physical possession. Some of these judicial refinements are more useful than others. I see no value at all in borrowing, as the majority does, from the formulation articulated in 1978 by the United States Court of Appeals for the District Columbia, which asks if the evidence has the "capability plausibly to suggest the likelihood that in some discernable fashion the accused had a substantial voice vis-à-vis the [contraband]." *United States* v. *Staten*, 581 F.2d 878, 884 (D.C. Cir. 1978). It is likewise unhelpful, in my view, to ask whether the defendant has the "power or authority to guide or manage" the contraband. (Internal quotation marks omitted.) *State* v. *Hill*, 201 Conn. 505, 516, 523 A.2d 1252 (1986). These standards are fine as generic statements describing the doctrine, but they add no practical value because they do little more than substitute one vague term for another and because they fail to provide useful guidance for determining the nature and degree of control, dominion, power or authority that will be considered sufficient to equate to actual physical possession.

Far greater assistance is provided by the simple principle that was invoked by the prosecutor, the defense, and the trial court in the present case to define the essence of constructive possession. The majority describes the consensus in this way: "In addressing the jury, the prosecutor, defense counsel, and the trial court all referred to [constructive possession] as the practical ability of the defendant to 'go and get' the gun [if she wished to do so], or the practical ability to obtain actual physical possession of it." Constructive possession, in other words, means that the defendant had both the intention and the practical ability to reduce the contraband to her actual physical possession if she so desired.[6] See, e.g., *Henderson* v. *United States*, supra, 575 U.S. 630 (defining constructive possession under federal felon in possession statute, 18 U.S.C. § 922 (g), as "hav[ing] the ability to use or direct the use of [the] firearms"); *United States* v. *Chauncey*, 420 F.3d 864, 873 (8th Cir. 2005) ("[t]he linchpin of the ownership, dominion, or control required for constructive possession is not direct, physical control, but the ability to reduce an object to actual possession" (internal quotation marks omitted)), cert. denied, 547 U.S. 1009, 126 S. Ct. 1480, 164 L. Ed. 2d 258 (2006); *United States* v. *Jenkins*, 90 F.3d 814, 822 (3d Cir. 1996) (Cowen, J., dissenting) ("the terms dominion and control are to be interpreted as

the ability to reduce an object to actual possession" (internal quotation marks omitted)); *United States* v. *Caballero*, 712 F.2d 126, 129 (5th Cir. 1983) ("[i]n essence, constructive possession is the ability to reduce an object to actual possession" (internal quotation marks omitted)); *State* v. *Richards*, 286 S.W.3d 873, 884–85 (Tenn. 2009) (Koch, J., dissenting) (defining constructive possession as "the ability to reduce an object to actual possession" (internal quotation marks omitted)); *State* v. *Jones*, 146 Wn. 2d 328, 333, 45 P.3d 1062 (2002) ("A defendant has actual possession when he or she has physical custody of the item and constructive possession if he or she has dominion and control over the item. . . . Dominion and control means that the object may be reduced to actual possession immediately." (Citation omitted.)); cf. *Bulkley* v. *Dolbeare*, 7 Conn. 232, 234–35 (1828) (to have constructive possession of property, "a plaintiff must have such a right as to be entitled to reduce the goods to actual possession, when he pleases" (internal quotation marks omitted)).

Our constructive possession jurisprudence provides additional guidance when, as in the present case, the state's case is not predicated on a claim of exclusive possession of the contraband but, instead, on the theory that the defendant and another person were in joint possession of the contraband. See footnote 1 of this opinion. "[When] the defendant is not in exclusive possession of the premises where the [contraband is] found, it may not be inferred that [the defendant] knew of the presence of the [contraband] and had control of [it], unless there are other incriminating statements or circumstances tending to buttress such an inference." (Internal quotation marks omitted.) *State* v. *Johnson*, 316 Conn. 45, 58, 111 A.3d 436 (2015). "Accordingly, [t]o mitigate the possibility that innocent persons might be prosecuted for possessory offenses . . . it is essential that the state's evidence include more than just a temporal and spatial nexus between the defendant and the contraband." (Internal quotation marks omitted.) *State* v. *Bowens*, 118 Conn. App. 112, 121, 982 A.2d 1089 (2009), cert. denied, 295 Conn. 902, 988 A.2d 878 (2010). "In such cases, the government is required to present direct or circumstantial evidence to show some connection or nexus individually linking the defendant to the contraband." (Internal quotation marks omitted.) *State* v. *Johnson*, supra, 62. Furthermore, there must be "a compelling correlation between the actions of a defendant prior to arrest and the conclusion of dominion and control" in order for a reviewing court to "find that the jury's conclusion was a reasonable inference." *State* v. *Billie*, 123 Conn. App. 690, 701, 2 A.3d 1034 (2010).

C

The remaining task is to apply the foregoing legal principles to determine whether the evidence of constructive possession was sufficient to support the jury's

verdict. I agree with the majority that, after the shooting, the evidence plainly was sufficient to support a reasonable inference that the defendant knew that Spann was in actual physical possession of a firearm. As I have discussed, however, driving a car with the knowledge that a passenger is in actual physical possession of a firearm is not enough to support an inference of constructive possession; the state must adduce evidence "*individually linking*" the defendant to the passenger's firearm. (Emphasis added; internal quotation marks omitted.) *State* v. *Johnson*, supra, 316 Conn. 62. The majority believes that "four circumstances" provided the crucial link between the defendant and Spann's firearm: (1) her control of the car; (2) her flight from the police; (3) her relationship with Spann; and (4) her physical access to Spann's firearm. I address each of these circumstances in turn and conclude, for the reasons that follow, that they are insufficient, both individually and collectively, to sustain the defendant's conviction.

First, as the majority acknowledges, when the defendant is not in exclusive possession of the residence or vehicle in which the contraband is found,[7] mere proximity to the contraband and knowledge of its presence are "not enough to establish constructive possession." (Internal quotation marks omitted.) Id. "The driver of a vehicle can transport passengers and their possessions without" being in constructive possession of "every object in the vehicle." *Flores-Abarca* v. *Barr*, 937 F.3d 473, 483 (5th Cir. 2019); see also *State* v. *Foster*, 128 Haw. 18, 30, 282 P.3d 560 (2012) (holding that evidence was insufficient to support defendant driver's conviction of being felon in possession of firearm, even though he knew his passenger was in actual physical possession of firearm, because control over car "is not by itself enough to establish constructive possession of contraband found there" (internal quotation marks omitted)). The United States Court of Appeals for the Fifth Circuit has aptly observed that dominion and control "over the vehicle . . . alone cannot establish constructive possession of a weapon found in the vehicle, particularly in the face of evidence that strongly suggests that somebody else exercised dominion and control over the weapon. . . . Although knowledge of a firearm's presence may be *evidence* of possession, knowing transportation does not conclusively establish constructive possession as a matter of law." (Citations omitted; emphasis in original; internal quotation marks omitted.) *Flores-Abarca* v. *Barr*, supra, 483.

The majority states that there are "additional circumstances under which the defendant operated the vehicle" in the present case that "buttressed an inference of an intent to control the gun contained within the vehicle . . . ." Footnote 13 of the majority opinion. According to the majority, these additional circumstances include "that she drove the vehicle to the place

where Spann discharged the gun" and that she "waited for him to get back in the vehicle with the gun after the shooting, notwithstanding that she was a felon . . . ."[8] Id. The flaw in the majority's reasoning is that these particular facts have no probative value, unless one assumes that the defendant was Spann's knowing accomplice to a premeditated crime using Spann's firearm, which, as I discuss later in this opinion, is a theory that the jury affirmatively *rejected* by acquitting the defendant of the crime of attempt to commit assault in the first degree in violation of General Statutes §§ 53a-59 (a) (1) and 53a-49 (a) (2). There is no evidence that the defendant even knew about Spann's firearm, much less that he intended to use it, until the moment the shooting occurred. By all accounts, Spann was back in the vehicle within a matter of seconds thereafter. In my view, it is speculative and, therefore, unreasonable to conclude that the defendant's operation of a motor vehicle under these factual circumstances was indicative of an intent to exercise control over *Spann's firearm*, as opposed to the *vehicle* in which Spann carried his firearm.

Simply put, the state failed to adduce any evidence linking the defendant to either Spann's firearm or any related criminality at any time prior to the shooting. There was no evidence, for example, that the defendant was involved in Spann's drug dealing enterprise. There were no drugs, drug packaging materials or significant amounts of cash found on the defendant's person or recovered from the interior of the vehicle. The state offered no evidence of any historical connection between the defendant and Spann's drug dealing. Likewise, there was no forensic evidence, such as fingerprint, DNA or ballistic evidence, individually linking the defendant to Spann's firearm, there was not any direct or circumstantial evidence indicating that the defendant had handled Spann's firearm that day or on any prior occasion, and there was no evidence that the defendant requested access to the firearm, reached out for the firearm, or leaned across the front seat in an effort to acquire the firearm from Spann. Nor was there any evidence indicating that Spann would have been willing to surrender physical possession of the firearm to the defendant upon request. The state, moreover, was unable to fill in these gaps using any inculpatory statements made by Spann or the defendant to the police regarding the defendant's possession of the firearm or participation in the shooting. This case, in other words, is devoid of the type of evidence that the courts of this state have found sufficient to link a defendant individually to contraband in nonexclusive possession cases. Cf. *State* v. *Winfrey*, 302 Conn. 195, 210–13, 24 A.3d 1218 (2011) (evidence was sufficient to establish that defendant driver knew of and exercised dominion and control over drugs found in center console of vehicle registered to defendant's wife when, following stop for

motor vehicle violation, defendant was seen dropping and swallowing package of suspected heroin to escape criminal liability and had more than $550 in cash and rolling papers on his person at time of arrest); *State* v. *Butler*, 296 Conn. 62, 79, 993 A.2d 970 (2010) (evidence was sufficient to support inference that defendant driver possessed narcotics found in console of vehicle because defendant's "manipulation of the console within which the narcotics were discovered, presumably to conceal that contraband, buttressed the jury's inference that the defendant knew about the narcotics and had control over them," and "there was significant evidence from which it was reasonable for the jury to infer that the defendant was a narcotics dealer"); *State* v. *Bowens*, supra, 118 Conn. App. 123–26 (evidence was sufficient to support defendant driver's criminal possession of firearm conviction because, in addition to fleeing from police, heroin and marijuana were found in car, defendant was in possession of $1293 in cash, shell casing found in car matched bullet from firearm recovered by police, and defendant had personal motive to carry firearm because he had been involved in shooting earlier that day); *State* v. *Sanchez*, 75 Conn. App. 223, 237–42, 815 A.2d 242 (evidence was sufficient to support inference that defendant driver had constructive possession of drugs because defendant was seen smoking marijuana filled cigar, officers smelled marijuana, defendant fled police while discarding cigar, and narcotics were found in plain view in open ashtray), cert. denied, 263 Conn. 914, 821 A.2d 769 (2003); *State* v. *Grant*, 51 Conn. App. 824, 829, 725 A.2d 367 (evidence was sufficient to support inference of constructive possession because "[t]wo experienced detectives familiar with the defendant identified him as the driver of the car and observed him receive money from a female and give her an item from a paper bag in a high drug traffic area," defendant "fled in his car when [a police officer] ordered him to shut off his engine," and defendant was observed "throw[ing] the paper bag from his car"), cert. denied, 248 Conn. 916, 734 A.2d 568 (1999). But cf. *State* v. *Cruz*, 28 Conn. App. 575, 580–81, 611 A.2d 457 (1992) (reversing defendant driver's conviction for possession of marijuana and possession of drug paraphernalia because defendant did not own vehicle in which marijuana seed and rolling papers were found, defendant's statement about past marijuana use was "minimally probative of the issue of dominion and control of the seed," and "[t]he evidence . . . equally supported a conclusion that the defendant was unaware of the presence of either the seed or the rolling papers and did not exercise dominion and control over them").[9]

This brings us to what I consider the heart of the case. The majority attributes great significance to the fact that the defendant "drove the vehicle 1.2 miles while being chased by the police in an effort to evade arrest" and considers this evasive conduct to be the

second circumstance supporting the inference that the defendant was in constructive possession of Spann's firearm. Footnote 13 of the majority opinion. More specifically, the majority concludes that the defendant's flight from the police (1) supported a reasonable inference that she drove the car with an intent to control the firearm itself in order to prevent the police from seizing the firearm after the shooting, and (2) revealed the defendant's consciousness of guilt with respect to the possession charge. I disagree. The issue is *not* whether the defendant's flight was criminal in nature or whether it may have been punishable under some other provision of the penal law, such as having a weapon in a motor vehicle in violation of § 29-38 (a). See part II of this opinion. More narrowly still, the issue is *not* whether the defendant's flight is evidence connecting her to the shooting committed by Spann or whether it reflects a guilty mind with regard to the shooting. Rather, the one issue that matters on appeal is whether the defendant's conduct supports a reasonable inference that she likely was fleeing the scene—not merely to avoid capture, and not merely to avoid her friend being arrested—*with the intention to exercise dominion or control over Spann's firearm*. On this record, I consider such a conclusion wholly speculative.

"[T]he probative value of evidence of flight is, in large part, dependent upon facts pointing to the motive [that] prompted it." *State* v. *Piskorski*, 177 Conn. 677, 723, 419 A.2d 866, cert. denied, 444 U.S. 935, 100 S. Ct. 283, 62 L. Ed. 2d 194 (1979). "We repeatedly have recognized that evidence of flight from the scene of a crime inherently is ambiguous." *State* v. *Luster*, 279 Conn. 414, 423, 902 A.2d 636 (2006). These observations apply fully to our consideration of the defendant's flight as evidence of her specific intention to control Spann's firearm. The defendant's flight under the circumstances of this case might have been prompted by various possible motivations or some combination thereof. Perhaps she simply was trying to help her friend escape apprehension. Or maybe she fled the scene out of pure undifferentiated fear, resulting from nothing more complicated than the obvious and overwhelming fact that she suddenly found herself in the middle of a highly volatile situation involving criminal activity perpetrated by her friend sitting in the passenger seat. In other words, the defendant could have been motivated by a "fight or flight" instinct, which prompted her to flee rather than to remain at the scene. The defendant might have been motivated by a sense of self-preservation, upon realizing that her very presence in the car, under the circumstances, created a high risk that she herself would be implicated in Spann's criminal activity. In addition, we have come to recognize that social factors unrelated to actual guilt or innocence often will also figure into a person's decision to flee due to that person's concerns about the perceptions that the police may formulate as a result

of demographic considerations. See *State* v. *Edmonds*, 323 Conn. 34, 74, 145 A.3d 861 (2016) ("[a]mong some citizens, particularly minorities and those residing in high crime areas, there is also the possibility that the fleeing person is entirely innocent but, with or without justification, believes that contact with the police can itself be dangerous, apart from any criminal activity associated with the officer's sudden presence" (internal quotation marks omitted)). Of course, I cannot say which of these (or any other) possibilities describe the actual motivations behind the defendant's flight because I have no way to know. But this is precisely the point. A jury's preference for one psychological explanation over another, like my own, could only be based on guesswork under the present factual circumstances.

If only to demonstrate that we are left merely to speculate among possibilities, I note my own view that, of the various possible inferences that have been proposed to explain why the defendant fled the scene and sought to evade the police, I consider the least plausible to be the idea that her flight, more likely than not, was motivated by a conscious desire to exercise control over Spann's firearm, as distinct from the car in which Spann's firearm happened to be located. Without more—and there is not more on this record—the supposition strikes me as particularly far-fetched. Again, there is no evidence that the defendant exhibited any particularized interest in Spann's firearm or that she, by words or action, demonstrated any "individualized" connection to the firearm. She did not, for example, reach out for the firearm, lean across the front seat and across (or under) Spann's body to grab the firearm, or engage in any other conduct indicating any particularized concern regarding the firearm. Cf. *State* v. *Bowens*, supra, 118 Conn. App. 123–24 (noting, among other indicia of intent, that "the defendant fled from the police and only the revolver was discarded, leaving the heroin and marijuana in the car," which "suggest[ed] that the motivation in fleeing was to jettison the revolver"); *McDaniels* v. *United States*, 718 A.2d 530, 531–32 (D.C. 1998) (upholding defendant's conviction because jury reasonably could have inferred from defendant's flight from police and attempted concealment of weapon that he was part of "an ongoing criminal operation" involving possession of weapon); *Logan* v. *United States*, 489 A.2d 485, 491–92 (D.C. 1985) (evidence was sufficient to support inference of constructive possession because jury reasonably could have found that defendant driver "pulled the car over and slowed down to permit [the front seat passenger] to open—and hold open—the passenger door (of a two-door vehicle) from the front seat while [the back seat passenger] . . . tossed out the gun from the rear, lower portion of the door"). On this evidentiary record, there are "so many reasons" for the defendant's flight "that it scarcely

comes up to the standard of evidence tending to establish guilt . . . ." (Internal quotation marks omitted.) *Alberty* v. *United States*, 162 U.S. 499, 510, 16 S. Ct. 864, 40 L. Ed. 1051 (1896); see also *State* v. *Billie*, supra, 123 Conn. App. 700 (inference of dominion and control over contraband must be based on more than "possibilities, surmise or conjecture").

The defendant was not in constructive possession of Spann's firearm at the moment prior to taking flight, and she did not acquire constructive possession of the firearm by driving away with Spann still in possession of that firearm. Stated another way, her flight did not change her possessory status vis-à-vis Spann's firearm. The circumstances would be different if the defendant had been involved in the shooting as a principal or accessory, if Spann's firearm was stowed within her reach during the police chase, if Spann had fled and left the defendant with unobstructed access to the firearm, or if the defendant's flight had caused some other change in circumstances creating a direct nexus between the defendant and the firearm itself. But the state established none of these things, by reasonable inference or otherwise.

For much the same reason, flight cannot serve to demonstrate the defendant's consciousness of guilt on these facts. "[C]onsciousness of guilt [is not] an element of the crime charged; the [g]overnment ha[s] to show that [the defendant intentionally] possessed [the contraband], not that she was aware that she might be involved in some sort of criminal activity." *United States* v. *Morales*, 577 F.2d 769, 773 (2d Cir. 1978). Evidence of this nature is generally understood to be of dubious probative value, and for good reason.[10] See, e.g., *State* v. *Jones*, 234 Conn. 324, 356, 662 A.2d 1199 (1995) (consciousness of guilt evidence "is a species of evidence that should be viewed with caution; it should not be admitted mechanically" (internal quotation marks omitted)).

One reason that the probative value of flight evidence is regarded with caution is that the conclusion that flight indicates guilt requires four intermediate inferential steps. "The probative value of flight as evidence of a defendant's guilt depends on the degree of confidence with which four inferences can be drawn: (1) from behavior to flight; (2) from flight to consciousness of guilt; (3) from consciousness of guilt to consciousness of guilt concerning the crime charged; and (4) from consciousness of guilt concerning the crime charged to actual guilt of the crime charged." (Internal quotation marks omitted.) *State* v. *Scott*, 270 Conn. 92, 105, 851 A.2d 291 (2004), cert. denied, 544 U.S. 987, 125 S. Ct. 1861, 161 L. Ed. 2d 746 (2005). Numerous courts have observed that "[t]he use of evidence of flight has been criticized on the grounds that the second and fourth inferences are not supported by common experience

and it is widely acknowledged that evidence of flight or related conduct is 'only marginally probative as to the ultimate issue of guilt or innocence.' " *United States* v. *Myers*, 550 F.2d 1036, 1049 (5th Cir. 1977), quoting *United States* v. *Robinson*, 475 F.2d 376, 384 (D.C. Cir. 1973). For this and related reasons, it is well established that consciousness of guilt alone is insufficient to support a criminal conviction. See *State* v. *Rosa*, 170 Conn. 417, 433, 365 A.2d 1135 ("[t]he flight of the person accused of [a] crime . . . *when considered together with all the facts of the case*, may justify an inference of the accused's guilt" (emphasis added; internal quotation marks omitted)), cert. denied, 429 U.S. 845, 97 S. Ct. 126, 50 L. Ed. 2d 116 (1976); see also *United States* v. *Pagán-Ferrer*, 736 F.3d 573, 594 (1st Cir. 2013) (trial court's instruction that "[n]o one can be convicted of a crime on the basis of consciousness of guilt alone" was proper (internal quotation marks omitted)), cert. denied sub nom. *Vidal-Maldonado* v. *United States*, 573 U.S. 933, 134 S. Ct. 2839, 189 L. Ed. 2d 810 (2014); *United States* v. *Johnson*, 513 F.2d 819, 824 (2d Cir. 1975) (holding that evidence of consciousness of guilt is "insufficient proof on which to convict where other evidence of guilt is weak and the evidence before the court is as hospitable to an interpretation consistent with the defendant's innocence as it is to the [g]overnment's theory of guilt"); *People* v. *Kelly*, 1 Cal. 4th 495, 531, 822 P.2d 385, 3 Cal. Rptr. 2d 677 (under California law, jury may consider evidence of consciousness of guilt, "*but it is not sufficient by itself to prove guilt*" (emphasis in original)), cert. denied, 506 U.S. 881, 113 S. Ct. 232, 121 L. Ed. 2d 168 (1992); *Commonwealth* v. *Toney*, 385 Mass. 575, 585, 433 N.E.2d 425 (1982) (jury cannot "convict a defendant on the basis of evidence of flight or concealment alone"); *People* v. *Yazum*, 13 N.Y.2d 302, 304, 196 N.E.2d 263, 246 N.Y.S.2d 626 (1963) (distinguishing between admissibility and sufficiency of consciousness of guilt evidence).

In the present case, the defendant's flight is not probative of her consciousness of guilt with respect to the theory that she was in possession of Spann's firearm for the same reasons it is not probative of her intent to possess Spann's firearm. Whether she fled out of undifferentiated fear, because she understood immediately that any claim of innocence, however truthful, would not be accepted by law enforcement under the circumstances, because she wanted to protect her friend Spann, or even because she believed herself to be actually guilty of some criminal act relating to the shooting (such as attempted assault or interfering with a police officer, for which she ultimately was acquitted by the jury), it is not reasonable to conclude on this record that she probably fled because she believed herself to be guilty of possessing Spann's firearm. "[T]he interpretation to be gleaned from an act of flight should be made with a sensitivity to the facts of the particular

case" because flight might be indicative of an intent to flee "an entirely different crime . . . ." *United States* v. *Ramon-Perez*, 703 F.2d 1231, 1233 (11th Cir.), cert. denied, 464 U.S. 841, 104 S. Ct. 136, 78 L. Ed. 2d 130 (1983). When a criminal defendant has been charged with multiple crimes, evidence of consciousness of guilt as to *one* crime does not equate to evidence of consciousness of guilt of *a different* crime. See, e.g., *United States* v. *Atchley*, 474 F.3d 840, 853 (6th Cir.) (observing that defendant's "alleged flight could have been due to the murder charge and not the charges here"), cert. denied, 550 U.S. 965, 127 S. Ct. 2447, 167 L. Ed. 2d 1145 (2007); *United States* v. *Hernandez-Bermudez*, 857 F.2d 50, 53 (1st Cir. 1988) ("[T]here is a difference between a consciousness of guilt about possessing cocaine and guilt about intending to distribute the drug. [The] [d]efendant's testimony acknowledged the former, but not the latter. But we doubt that [the defendant's] flight could any more show consciousness of guilt over the *distribution* of cocaine than over its conceded possession." (Emphasis in original.)). I doubt it, but the defendant's flight might have been indicative of her consciousness of actual guilt as to certain criminal offenses that are not at issue in this appeal, such as using a motor vehicle without the owner's permission. See General Statutes § 53a-119b (a). It is not indicative of her consciousness of guilt of the specific crime under consideration—criminal possession of Spann's firearm in violation of § 53a-217 (a).

The majority, quoting *State* v. *Otto*, 305 Conn. 51, 74, 43 A.3d 629 (2012), relies on the uncontroverted but also unhelpful premise that the jury was " 'not required to draw only those inferences consistent with innocence' " to conclude that "the possibility of other, innocent 'inferences from these facts is not sufficient to undermine [the jury's] verdict . . . .' " Of course that is true. It does not follow, however, that the *plausibility* of the inculpatory inferences is immaterial to our sufficiency review. As we explained in *State* v. *Reynolds*, supra, 264 Conn. 1, "[a]n inference is not legally supportable . . . merely because the scenario that it contemplates is remotely possible under the facts. To permit such a standard would be to sanction fact-finding predicated on mere conjecture or guesswork. Proof by inference is sufficient, rather, only if the evidence produces in the mind of the trier a *reasonable belief in the probability of the existence* of the material fact." (Emphasis in original; internal quotation marks omitted.) Id., 97. Under the factual circumstances of the present case, an inference that the defendant fled the scene of the shooting in order to exercise dominion or control over Spann's firearm is possible but by no means reasonably probable. See id., 97–98 (holding that evidence was insufficient to establish aggravating factor under General Statutes (Rev. to 1991) § 53a-46a (h) (4), even though "it probably would not have been *impossible*

for the defendant to have formulated the intent to torture [the victim] in the extremely brief period of time between the firing of the first shot and the firing of additional gunshots" because "the likelihood that the defendant had changed his intent . . . is too remote to be reasonable" (emphasis in original)).

In summary, the evidence of flight adds no force to the otherwise insufficient evidence of constructive possession. Pointing to the defendant's consciousness of guilt or her subjective belief that she may be guilty of a crime cannot provide the state with the evidence of constructive possession that it otherwise lacks.

The third circumstance that the majority relies on, the defendant's relationship with Spann, fares no better and supplies no additional weight to support the defendant's conviction. It is a fundamental precept that mere friendship or association with a known criminal "does not establish a logical connection with the [criminal's] crime." *State* v. *Kelsey*, 160 Conn. 551, 553, 274 A.2d 151 (1970). Indeed, we previously have observed that it "would clearly be improper" for the jury to infer guilt on the basis of "mere association . . . ." Id., 554; see also *United States* v. *Di Re*, 332 U.S. 581, 593, 68 S. Ct. 222, 92 L. Ed. 210 (1948) (reversing defendant's conspiracy conviction, even though he was present in car in which counterfeit ration coupons were found, because "[p]resumptions of guilt are not lightly to be indulged from mere meetings"); *United States* v. *Nusraty*, 867 F.2d 759, 764 (2d Cir. 1989) (reversing defendant's conviction of conspiracy to possess heroin with intent to distribute because "mere association with those implicated in an unlawful undertaking is not enough to prove knowing involvement").

The claim is especially weak in the present case because the jury affirmatively rejected the state's theory that the defendant intended to facilitate the shooting by acting as Spann's getaway driver. The state pursued its getaway driver theory with respect to the charge of attempt to commit assault in the first degree, but the jury was not persuaded and found the defendant not guilty of aiding Spann in the shooting. Because the trial was bifurcated, the jury considered the charge of criminal possession of a firearm after the defendant had been found not guilty of aiding Spann's attempted assault and interfering with an officer but guilty of having a weapon in a motor vehicle, using a motor vehicle without the owner's permission, and reckless driving. With respect to the criminal possession charge, the jury was not instructed on accessorial liability, and the state did not argue that the defendant constructively possessed Spann's firearm by acting as his getaway driver. Instead, the state argued that the defendant constructively possessed Spann's firearm because "she was aware of . . . the presence of the gun" and she easily could "get it" within the close confines of the motor

vehicle. Thus, although the majority declines to accept this simple fact, the state in its closing argument entirely abandoned its joint criminal venture theory, premised on the defendant being Spann's getaway driver, in favor of a theory that the defendant was in constructive possession of Spann's firearm because she could "exercise dominion and control [over it] within [the] relatively small space of the interior of the [vehicle]."

The majority thus advances a "getaway driver" theory in support of the possessory crime that the state itself did not make in its argument to the jury on that charge. The risk of becoming a seventh juror, it seems, is open to all comers. Our duty to construe the evidence in the light most favorable to sustaining the verdict should not, in my view, be taken as an invitation to substitute new legal theories for the arguments used by the state to obtain the conviction at trial. Cf. *State* v. *Carter*, 317 Conn. 845, 853–54, 120 A.3d 1229 (2015) ("When the state advances a specific theory of the case at trial . . . sufficiency of the evidence principles 'cannot be applied in a vacuum. Rather, they must be considered in conjunction with an equally important doctrine, namely, that the state cannot change the theory of the case on appeal.'"). Moreover, the state did not advance a getaway driver theory on the possession charge for good reason, namely, because the jury already had rejected that theory when it acquitted the defendant of attempted assault by acting as Spann's accomplice in the shooting. The majority's efforts to resurrect the state's abandoned and rejected theory are unavailing.[11]

This brings me to the fourth and weakest circumstance relied on by the majority—the fact that "the defendant sat within arm's reach of the gun throughout the afternoon." What this theory ignores is that there was, at all times, an animate physical mass separating the defendant's arm from the firearm, and his name was Lamar Spann. There is no evidence of any kind that Spann's firearm was even momentarily stowed in the center console, the glove compartment, or any other communal space within the vehicle to which the defendant had access. Instead, the evidence before the jury established that Spann had the firearm either on or under his person at all relevant times.[12] Because the firearm was in Spann's exclusive physical possession, the defendant's proximity to Spann in the relatively small confines of the interior of the car is insufficient to support a reasonable inference that she had the ability and intent to exercise dominion and control over his firearm, that is, to "go and get it." As the District of Columbia Court of Appeals explained: "[T]here is no 'automobile' exception to the settled general rule that knowledge and proximity alone are insufficient to prove constructive possession of [contraband] beyond a reasonable doubt. . . . As in all other constructive possession cases, there must be something more in the totality of the circumstances—a word or deed, a relationship or

other probative factor—that, considered in conjunction with the evidence of proximity and knowledge, proves beyond a reasonable doubt that the [defendant] *intended* to exercise dominion or control over the [contraband], and was not a mere bystander." (Emphasis in original.) *Rivas* v. *United States*, 783 A.2d 125, 128 (D.C. 2001). Although "[i]t may be foolish to stand by when others are acting illegally, or to associate with those who have committed a crime . . . [s]uch conduct or association . . . *without more*, does not establish" constructive possession. (Emphasis in original; internal quotation marks omitted.) Id., 130; see *State* v. *Nova*, 161 Conn. App. 708, 724, 129 A.3d 146 (2015) (reversing defendant's possession of narcotics conviction because defendant's "mere proximity" to contraband and interaction with individual who had snorted some unknown substance was insufficient to establish dominion or control over contraband, and "[t]o conclude otherwise required the [trial] court to engage in impermissible speculation"); *State* v. *Fermaint*, 91 Conn. App. 650, 657–63, 881 A.2d 539 (evidence was insufficient to establish that defendant violated his probation by possessing narcotics because driver of vehicle was in actual physical possession of narcotics, and evidence that defendant, who was passenger in vehicle, engaged in "nondescript furtive movement" before traffic stop and was in proximity to crumbs of crack cocaine found on seat did not establish individual connection between defendant and narcotics), cert. denied, 276 Conn. 922, 888 A.2d 90 (2005).

The majority points out that "[t]he jury did not have to credit" Spann's testimony that the firearm was in his exclusive physical possession before, during, and after the shooting, and that it was "entitled to credit Spann's testimony that the gun was located in the area of the front seat while discrediting his claims that he physically held the gun in a way that prevented the defendant from accessing it . . . ." The argument is that Spann was a drug dealer, a convicted felon, a liar, and the defendant's loyal friend, and, therefore, "[t]he jury had good reason to question [his] credibility . . . ." According to the majority's hypothesis, Spann's "tale seeking to exonerate the defendant" not only "strained credibility"; it was "risible," "sidesplitting," and would cause "the jurors' eyes [to roll] . . . ." I agree with the majority that the jury was free to discredit all, a portion, or none of Spann's testimony. I decline, however, to engage in a fictional account of the jury's conduct at trial, and I strenuously disagree with the majority's suggestion that Spann's testimony can be dissected in a manner that inculpates the defendant in his possessory crime. The argument itself would be risible if the occasion was less solemn. The jury, of course, was free to disbelieve Spann's testimony that he "assiduously kept the gun where [the defendant] could not get it," but it was not free to infer the opposite, namely, that Spann

placed the gun in a location to which the defendant had physical access. See, e.g., *Woodall* v. *State*, 97 Nev. 235, 236–37, 627 P.2d 402 (1981) (holding that evidence was insufficient to support defendant's conviction of possession of firearm when defendant's companion "acknowledged that the weapon was his and that [the defendant] knew nothing about its existence," reasoning that "a rational trier of fact could not reject a plausible explanation consistent with [the defendant's] innocence, and thereupon infer [the defendant] to be guilty based on evidence from which only uncertain inferences may be drawn"). "[I]t is axiomatic under Connecticut law that, while a [trier of fact] may reject a defendant's testimony, a [trier of fact] in rejecting such testimony cannot conclude that the opposite is true. . . . Thus, under Connecticut law, the [trier of fact] is not permitted to infer, from its disbelief of the defendant's testimony that any of the facts which he denied were true."[13] (Internal quotation marks omitted.) *State* v. *McCarthy*, 105 Conn. App. 596, 619, 939 A.2d 1195, cert. denied, 286 Conn. 913, 944 A.2d 983 (2008). This rule "has been applied uniformly in both criminal and civil contexts"; (internal quotation marks omitted) id., 620; regardless of whether the witness' testimony was proffered by the plaintiff or the defendant. See, e.g., *State* v. *Hart*, 221 Conn. 595, 605–606, 605 A.2d 1366 (1992) (although jury was free to disbelieve testimony of defense witnesses that defendant was not drug-dependent, it was not free to infer opposite); see also *State* v. *Alfonso*, 195 Conn. 624, 634–35, 490 A.2d 75 (1985) ("[e]ven if the jury did not credit the defendant's denial, it was not entitled to conclude that the marijuana was his without positive evidence supporting such a conclusion," and "the state offered no supporting evidence that would have justified an inference that the defendant possessed the marijuana"); *Novak* v. *Anderson*, 178 Conn. 506, 508, 423 A.2d 147 (1979) ("While it is true that it is within the province of the jury to accept or reject a defendant's testimony, a jury in rejecting such testimony cannot conclude that the opposite is true. . . . A jury cannot, from a disbelief of a defendant's testimony, infer that a plaintiff's allegation is correct." (Citations omitted.)). "Our rule barring the inference of the opposite of testimony" is evidentiary in nature and ensures "the proper method of measuring the sufficiency of the evidence." *State* v. *Hart*, supra, 605–606. Thus, even if the jury disregarded Spann's testimony,[14] given that the state failed to adduce any "[positive] evidence that would have justified an inference that the defendant possessed" Spann's firearm; *State* v. *Alfonso*, supra, 634–35; the evidence was insufficient to support the defendant's criminal possession of a firearm conviction.[15]

In my view, the majority piles speculative inference on top of speculative inference to uphold the defendant's criminal possession of a firearm conviction. For

the reasons previously explained, a driver's knowledge that his or her front seat passenger is in actual physical possession of contraband is insufficient to support a reasonable inference that the driver had dominion or control over that contraband; flight from the police does not vest a driver with constructive possession of contraband that he or she did not possess before taking flight; a defendant's knowing association with a person in actual physical possession of contraband is insufficient to establish that the defendant had the power and intent to control that contraband; disbelief of a witness' testimony cannot supply the state with the positive evidence of guilt that it otherwise lacks; and the accumulated weight of these flawed inferences will not support a criminal conviction that cannot rest independently on any one of them. Accordingly, I dissent from part I of the majority opinion.

## II

I agree with the majority that the evidence was sufficient to convict the defendant of the crime of having a weapon in a motor vehicle in violation of § 29-38 (a). In light of what already has been said, however, it should be clear that I do not agree with the majority that the defendant's conviction can be sustained on the basis of a finding that she constructively possessed Spann's firearm. I nonetheless would uphold the defendant's conviction because possession is not an essential element of the crime. What is required instead is proof that the defendant "(1) owned, operated or occupied the vehicle; (2) had a weapon in the vehicle; (3) knew the weapon was in the vehicle; and (4) had no permit or registration for the weapon." *State* v. *Davis*, 324 Conn. 782, 801, 155 A.3d 221 (2017); see also *State* v. *Owens*, 25 Conn. App. 181, 186, 594 A.2d 991 ("[t]here are four elements that the state must prove in a prosecution for a violation of . . . § 29-38: (1) that the defendant owned, operated or accepted the vehicle; (2) that he had a weapon in the vehicle; (3) that he knew the weapon was in the vehicle; and (4) that he had no permit or registration for the weapon"), cert. denied, 220 Conn. 910, 597 A.2d 337 (1991). The state is not required to prove possession—actual or constructive— to obtain a conviction under § 29-38 (a). See *State* v. *Owens*, supra, 187–88 ("[t]he clear intent of § 29-38 is to make it a crime to have a weapon in a motor vehicle, and '[t]he statute is not concerned with possession or ownership of a weapon, but rather aims to penalize those who know that there is a weapon inside a motor vehicle' "), quoting *State* v. *Mebane*, 17 Conn. App. 243, 246, 551 A.2d 1268, cert. denied, 210 Conn. 811, 556 A.2d 609, cert. denied, 492 U.S. 919, 109 S. Ct. 3245, 106 L. Ed. 2d 591 (1989).

The defendant concedes that, under our current case law, the evidence is sufficient to sustain her conviction because the jury reasonably could have found that she

operated a motor vehicle, there was a weapon inside the vehicle, she knew there was a weapon inside the vehicle, and the weapon had no permit or registration. The defendant asks this court to reconsider and overrule our case law defining the essential elements of the crime of having a weapon in a motor vehicle, arguing that "[t]his court has misinterpreted the legislative intent of [the] statute" because the legislature intended the term "knowingly has" in § 29-38 (a) to be construed as "knowingly possesses."

The defendant failed to preserve her statutory construction claim in the trial court, and it is well established that this court generally will not review claims raised for the first time on appeal unless the requirements for review under *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989), as modified by *In re Yasiel R.*, 317 Conn. 773, 781, 120 A.3d 1188 (2015),[16] have been satisfied or reversal is warranted under the plain error doctrine or our supervisory authority. The defendant's statutory construction claim fails under the second prong of *Golding* because it is not a claim of constitutional magnitude alleging the violation of a fundamental right. See *State* v. *Golding*, supra, 240 (observing that nonconstitutional claims "do not warrant special consideration simply because they bear a constitutional label"); see also *State* v. *Rodriguez-Roman*, 297 Conn. 66, 93, 3 A.3d 783 (2010) (declining to review insufficiency of evidence and instructional impropriety claims because "the defendant has clothed what can only be described as a nonconstitutional claim in constitutional garb"). The defendant also cannot prevail under the plain error doctrine because "[i]t is axiomatic that the trial court's proper application of the law existing at the time of trial cannot constitute reversible error under the plain error doctrine." *State* v. *Diaz*, 302 Conn. 93, 104 n.8, 25 A.3d 594 (2011). Lastly, this is not one of those rare cases that merits the invocation of the "extraordinary remedy" of reversal under our supervisory authority. (Internal quotation marks omitted.) *State* v. *Reyes*, 325 Conn. 815, 822–23, 160 A.3d 323 (2017); see id. ("[T]he supervisory authority of this state's appellate courts is not intended to serve as a bypass to the bypass, permitting the review of unpreserved claims of case specific error—constitutional or not—that are not otherwise amenable to relief under *Golding* or the plain error doctrine. . . . Consistent with this general principle, we will reverse a conviction under our supervisory powers only in the rare case that fairness and justice demand it. [T]he exercise of our supervisory powers is an extraordinary remedy to be invoked only when circumstances are such that the issue at hand, while not rising to the level of a constitutional violation, is nonetheless of [the] utmost seriousness, not only for the integrity of a particular trial but also for the perceived fairness of the judicial system as a whole." (Citations omitted; internal quotation

marks omitted.)). There being no basis for reversal, I would uphold the defendant's conviction of having a weapon in a motor vehicle.

For the foregoing reasons, I dissent from part I of the majority opinion upholding the defendant's conviction of criminal possession of a firearm in violation of § 53a-217 (a) and concur in part II of the majority opinion upholding the defendant's conviction of having a weapon in a motor vehicle in violation of § 29-38 (a).

[1] The record reflects that Spann was convicted of various crimes arising out of the August 17, 2013 shooting, including criminal possession of the firearm in question. The primary issue on appeal is whether the evidence is legally sufficient to establish beyond a reasonable doubt that the defendant jointly possessed Spann's firearm by operating the vehicle in which Spann was a passenger while he was in actual physical possession of the firearm.

[2] It is undisputed that the defendant in this case never had actual physical possession of Spann's firearm. Indeed, the trial court granted the defendant's motion for a judgment of acquittal on the charge of carrying a pistol without a permit in violation of General Statutes § 29-35 (a) on the ground that there was no evidence that the defendant had "carried [the firearm] on . . . her person . . . ."

[3] This court long ago observed that, "[a]s to 'possession,' there is no word more ambiguous in its meaning." *Hancock* v. *Finch*, 126 Conn. 121, 122–23, 9 A.2d 811 (1939), citing *National Safe Deposit Co.* v. *Stead*, 232 U.S. 58, 34 S. Ct. 209, 58 L. Ed. 504 (1914). *Hancock* is a civil case, but courts and commentators alike often have made the same point in connection with the law of criminal possession. One scholarly article begins with this oft-quoted observation: "The word 'possession,' though frequently used in both ordinary speech and at law, remains one of the most elusive and ambiguous of legal constructs." C. Whitebread & R. Stevens, "Constructive Possession in Narcotics Cases: To Have and Have Not," 58 Va. L. Rev. 751, 751 (1972); see also *Henderson* v. *United States*, supra, 575 U.S. 625–30 (addressing definitional difficulty in case requiring court to decide whether person lawfully can transfer gun to third party without thereby illegally possessing it); *State* v. *Schmidt*, 110 N.J. 258, 266–70, 540 A.2d 1256 (1988) (discussing definitional difficulty and wide spectrum of views); *State* v. *Barber*, 135 N.M. 621, 626, 92 P.3d 633 (2004) ("The legal definition of possession is not necessarily rooted in common discourse. . . . Courts differ on whether the legal concept of possession is a common term with no artful meaning or the most vague of all vague terms." (Citation omitted; internal quotation marks omitted.)); 1 W. LaFave, Substantive Criminal Law (2d Ed. 2003) § 6.1 (e), p. 432 ("[t]he word 'possession' is often used in the criminal law without definition, which perhaps reflects only the fact that it is 'a common term used in everyday conversation that has not acquired any artful meaning' "). "Of this chameleon-hued word," says legal lexicographer Bryan A. Garner, "a legal philosopher pessimistically states: The search for [its] proper meaning . . . is likely to be a fruitless one." (Internal quotation marks omitted.) B. Garner, Dictionary of Legal Usage (3d Ed. 2011) p. 688, quoting G. Paton, A Textbook of Jurisprudence (4th Ed. 1972) p. 553.

[4] In light of Spann's testimony that he was sitting on the firearm during most of the relevant time, it is noteworthy that the origin of the word "possession" traces back to the Latin words for "able to sit upon." See Webster's Third New International Dictionary, supra, p. 1770 ("fr[om] *potis* able, possible [and] *sedre* to sit"). No doubt Spann possessed the gun.

[5] As the trial court properly instructed the jury, the terms "dominion" and "control" are "synonymous, meaning they are different terms used to describe the same thing."

[6] It is not necessary that the defendant manifest the requisite intention by *exercising* her practical ability to obtain actual physical possession of the contraband, only that she could do so if she so desired. As this court explained in *State* v. *Hill*, supra, 201 Conn. 516, "[t]he essence of exercising control is not the manifestation of an act of control but instead it is the act of being in a position of control coupled with the requisite mental intent. In our criminal statutes involving possession, this control must be exercised intentionally and with knowledge of the character of the controlled object."

[7] The majority's reliance on *State* v. *Delossantos*, 211 Conn. 258, 277–78, 559 A.2d 164, cert. denied, 493 U.S. 866, 110 S. Ct. 188, 107 L. Ed. 2d 142 (1989), to support the proposition that "[o]ne who owns or exercises

dominion or control over a motor vehicle in which [contraband] is concealed may be deemed to possess the contraband" is misplaced. In *Delossantos*, the defendant was the "lone occupant of the automobile"; id., 261; and, when a driver is in *exclusive* possession of an automobile, it is reasonable to infer that he or she had both the power and intent to exercise dominion or control over the contents of that automobile. As we explained in *Delossantos*, however, "[w]here the defendant is *not* in exclusive possession of the premises where the [contraband is] found, it may *not* be inferred that [the defendant] knew of the presence of the [contraband] and had control of [it], *unless there are other incriminating statements or circumstances tending to buttress such an inference.*" (Emphasis added; internal quotation marks omitted.) Id., 277. Thus, in the absence of additional evidence—which, for the reasons explained in the body of this opinion, I believe is lacking in this case—the defendant's knowledge of Spann's firearm and her control of the car do not support a reasonable inference that she constructively possessed Spann's firearm.

[8] The majority also observes that the defendant "drove the vehicle 1.2 miles while being chased by the police in an effort to evade arrest for her participation in the shooting . . . ." Footnote 13 of the majority opinion. I address this point later in this opinion in connection with the majority's discussion regarding the significance of the defendant's "flight" immediately following the shooting incident.

[9] The difference between the majority opinion and this concurring and dissenting opinion can be summarized as the difference between the view that such additional evidence "might have helped to establish constructive possession," as the majority acknowledges, and my view that the conviction cannot be sustained in the absence of at least some additional evidence of this nature.

[10] See, e.g., *Wong Sun* v. *United States*, 371 U.S. 471, 483 n.10, 83 S. Ct. 407, 9 L. Ed. 2d 441 (1963) ("we have consistently doubted the probative value in criminal trials of evidence that the accused fled the scene of an actual or supposed crime"); *Alberty* v. *United States*, supra, 162 U.S. 511 ("it is a matter of common knowledge that men who are entirely innocent do sometimes fly from the scene of a crime through fear of being apprehended as the guilty parties, or from an unwillingness to appear as witnesses"). In support of its view that evidence of flight "is a species of evidence that should be viewed with caution," the United States Court of Appeals for the First Circuit explained: "Although it is undisputed that flight of an accused can properly be admitted as having a tendency to prove guilt . . . it also is acknowledged widely that, at least in many cases, such evidence is only marginally probative as to the ultimate issue of guilt or innocence. . . . [The inference of guilt] has been questioned by some courts, one of which asserted that men who are entirely innocent do sometimes fly from the scene of a crime for a multitude of reasons, including, for example, hesitation to confront even false accusations, fear that they will be unable to prove their innocence, or protection of a guilty party." (Citations omitted; internal quotation marks omitted.) *United States* v. *Hernandez-Bermudez*, 857 F.2d 50, 54 (1st Cir. 1988); see also *United States* v. *Chipps*, 410 F.3d 438, 449 (8th Cir. 2005) ("courts should be cautious in admitting evidence of flight because it is often only marginally probative of guilt"); *United States* v. *Rodriguez*, 53 F.3d 1439, 1451 (7th Cir. 1995) ("[w]e have long adhered to the [United States] Supreme Court's counsel that courts be wary of the probative value of flight evidence" (internal quotation marks omitted)). Chief Judge David L. Bazelon, quoting Sigmund Freud, provided a psychological basis for questioning the assumption that a suspect's flight necessarily reflects his actual guilt, as sometimes the suspect "is really not guilty of the specific misdeed of which he is being accused, but he is guilty of a similar [misdemeanor] of which [the authorities] know nothing and of which [the authorities] do not accuse him. He therefore quite truly denies his guilt in the one case, but in doing so betrays his sense of guilt with regard to the other." (Internal quotation marks omitted.) *Miller* v. *United States*, 320 F.2d 767, 772 (D.C. Cir. 1963).

[11] The majority points out that the verdict finding the defendant guilty on the possession charge is not necessarily inconsistent with the verdict finding the defendant not guilty of attempted assault as an accessory. See footnote 18 of the majority opinion. The majority posits that the jury may have concluded that the defendant shared Spann's intention with regard to shooting the firearm but not his intention to cause serious physical injury. This "asymmetrical intentions" scenario is not impossible as a matter of abstract logic, but it is unlikely, to say the least, that a lay jury entertained (much less

adopted) the needle threading theory posited by the majority—particularly when the state itself never promoted that theory. Logical possibility is not the same as reasonable probability, and it remains highly improbable on this record that the jury decided to convict the defendant of criminal possession of a firearm on the basis of a theory *that was never even advanced by the state with respect to that charge.*

The question, moreover, is not one of theoretical consistency but of evidentiary sufficiency. Even if we were to assume that the jury logically could have adopted a theory of accessorial guilt not argued by the state in support of the charge at issue, by crediting the state's getaway driver theory on the criminal possession charge after rejecting that theory with respect to the attempted assault charge, I disagree with the majority that the jury reasonably could have done so on this evidentiary record. As I previously explained, there was no evidence that the defendant had any knowledge that Spann even was carrying a firearm prior to the shooting; nor was there any evidence of a prior joint criminal activity or any prior planning. I am left to conclude under these circumstances that the evidence necessarily was insufficient to support a reasonable inference that "[the defendant] and Spann brought the gun to Trumbull Avenue for the purpose of firing it and that the defendant would serve as the getaway driver." Footnote 18 of the majority opinion. It seems likely that the state did not argue this inference because the evidence did not support it.

[12] Prior to the shooting, Spann testified that he kept the firearm concealed "under [his] lap . . . ." After the shooting, Spann either held or briefly lodged the firearm "on the side of the door . . . in between the seat and the door."

[13] The prohibition against the antithesis inference is not unique to Connecticut; it is "hornbook law" recognized in state and federal courts throughout the country. *Walker* v. *New York*, 638 Fed. Appx. 29, 31 (2d Cir. 2016); see, e.g., id. ("it is hornbook law that a plaintiff does not carry his burden of proving a fact merely by having witnesses deny that fact and asking the jury to decline to believe the denials"); *Grimm* v. *State*, 135 A.3d 844, 859 (Md. 2016) ("[m]any jurisdictions, including Maryland, recognize the doctrine that disbelief of testimony may not alone support a finding in civil and criminal litigation" (internal quotation marks omitted)); *Chapman* v. *Troy Laundry Co.*, 47 P.2d 1054, 1062 (Utah 1935) ("[w]hile the demeanor of the witness in testifying is very important and should be given consideration by the trier of fact, still there must be something more than the batting of an eye, the coloring of the cheek, or the twiddling of the thumbs as a basis for finding facts"); A. Pollis, "The Death of Inference," 55 B.C. L. Rev. 435, 461–62 (2014) ("[C]ourts, including the [United States] Supreme Court, have generally been hostile to accepting the probative value of the antithesis inference, especially without other evidence in support of the party carrying the burden of proof. For example, in 1891, the [c]ourt in *Bunt* v. *Sierra Butte Gold Mining Co.* [138 U.S. 483, 485, 11 S. Ct. 464, 34 L. Ed. 1031 (1891)] held that a plaintiff could not meet his burden of proof by calling the defendant's employees as witnesses in the hope that the jury would disbelieve them. Over the years, numerous cases have similarly rejected the antithesis inference as an adequate basis for submitting a case to the jury. The First Circuit explained that the danger of permitting the antithesis inference was 'obvious,' as it would allow a plaintiff to prove its case solely through impeachment." (Footnotes omitted.)).

[14] The majority states that my analysis "relies on and credits the entirety of Spann's testimony" and "accept[s] Spann's testimony at face value . . . ." Footnote 22 of the majority opinion. I do not understand what prompts this statement, and it is not true. To repeat, the jury was entitled to accept all, some, or *none* of Spann's testimony. Regardless of whether, and to what extent, the jury credited Spann's testimony, there simply is no evidence in the record that the firearm at any time was located anywhere except for where the police saw it—in Spann's physical possession. Without relying on pure speculation, in other words, no reasonable juror could find that Spann probably left his firearm, however briefly, in an area of the vehicle where the defendant could "go and get it" during the high-speed police chase. Guesswork is not the same as reasonable inference.

[15] The majority's reliance on *Maryland* v. *Pringle*, 540 U.S. 366, 124 S. Ct. 795, 157 L. Ed. 2d 769 (2003), in support of its definition and application of the constructive possession doctrine is misplaced. In *Pringle*, drugs were found in the common area of a motor vehicle, and the United States Supreme Court observed that the "quantity of drugs and cash in the car indicated the likelihood of [all occupants being involved in] drug dealing . . . ." Id.,

373. Importantly, there was no evidence "singling out" any one of the occupants of the vehicle as the owner of the drugs, and the court cautioned that " '[a]ny inference that everyone on the scene of a crime is a party to it must disappear if the [g]overnment . . . singles out the guilty person.' " Id., 374, quoting *United States* v. *Di Re*, supra, 332 U.S. 594. In the present case, Spann not only confessed to his exclusive ownership and possession of the firearm, he also pleaded guilty to carrying the firearm without a permit and criminal possession of the firearm. Given that the state "single[d] out" and convicted "the guilty person," any inference that the defendant was involved in Spann's criminal possession of the firearm "must disappear" in the present case. (Internal quotation marks omitted.) Id.

[16] Under *State* v. *Golding*, supra, 213 Conn. 233, "a defendant can prevail on a claim of constitutional error not preserved at trial only if *all* of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation . . . exists and . . . deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt. In the absence of any one of these conditions, the defendant's claim will fail." (Emphasis in original; footnote omitted.) Id., 239–40; see *In re Yasiel R.*, supra, 317 Conn. 781 (modifying third prong of *Golding*).